729 A.2d 354

**Bernadette DiPINO et al.**

v.

**Wayne Nelson DAVIS.**

**No. 78, Sept. Term, 1998.**

Court of Appeals of Maryland.

May 11, 1999.

20

22

Guy R. Ayres, III (Ayres, Jenkins, Gordy & Almand, P.A., on brief), Ocean City, for petitioners.

Peter Ayers Wimbrow, III, on brief, Ocean City, for respondent.

Deborah A. Jeon, Dwight H. Sullivan, American Civil Liberties Union Foundation of Maryland, Centreville, for amicus curiae.

C. Christopher Brown, Maryland Trial Lawyers Ass'n, Baltimore, for amicus curiae.

Stephen H. Sachs, David Gray, Francisco Medina, Wilmer, Cutler & Pickering, Washington, DC, counsel of record for amicus curiae.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and THEODORE G. BLOOM (retired, specially assigned), JJ.

WILNER, Judge.

This is the second appearance of this case before this Court. It involves an action filed in the Circuit Court for Worcester County by Wayne Davis against the Mayor and City Council of Ocean City (the City), Bernadette DiPino, a police officer employed by the City, and Donald Turner, a District Court Commissioner. The action was first filed in December, 1991, but we are concerned here with an amended complaint filed in April, 1995. Mr. Davis's complaint, alleging both Constitutional violations and common law torts, arises from his arrest on July 6, 1991, upon a charge of hindering and obstructing Officer DiPino and a fellow officer, Alice Brumbley, in the performance of their duties. The arrest was pursuant to a warrant and Statement of Charges issued by Commissioner Turner upon application of DiPino.

At issue before us is whether (1) the evidence sufficed to establish the violations and torts alleged, (2) if so, DiPino and the City are immune from liability, and (3) certain claims against the City were preserved for appellate review. Some of the underlying facts were in dispute, mostly as to what Davis knew about DiPino and what was said by Davis and DiPino at various times.

## BACKGROUND

During the period most relevant to this case—from the spring of 1990 through the first week of July, 1991—Officer DiPino worked as an undercover narcotics agent for the City police department. Her job required her to identify drug dealers and purchase drugs from them, and she therefore had to develop contacts and build trust with potential sellers. The plaintiff, Wayne Davis, was a bartender at the Inlet Lodge on the Ocean City boardwalk, where he had worked for about 10 years. DiPino first learned of Davis through an informant, who told her that he had seen marijuana in Davis's apartment. Nothing immediate came of that information.

In the spring of 1990, DiPino met Davis on the boardwalk and, as part of a "reversal" operation—an attempt to sell, rather than buy, drugs—she told him that she had some marijuana for sale and wanted to trade it for cocaine. She said that they discussed such a trade and exchanged telephone numbers, that, as a result of that conversation, Davis became a "target," and that she made a number of attempts during the summer of 1990 to consummate a drug trade with Davis, without success.[1] We need not recount the several ensuing contacts between DiPino and Davis. It will suffice to say that, by the end of September, 1990, Davis had sufficient information to believe that DiPino was an undercover police officer, that DiPino suspected that Davis was aware of her occupation, and that, as a result, she terminated her effort to engage him in a drug transaction. Some of Davis's suspicion arose from his having seen DiPino twice in the company of a person—Sergeant Holtzman—whom he knew to be a police sergeant; some of it came from his seeing her leave the courthouse and learning that she had just testified in a drug case.

The event that ultimately led to Davis's arrest occurred in the late hours of May 11–12, 1991. Davis had just closed the

---

1. Davis admitted the encounter on the boardwalk, but, as to any conversation about drugs, said only that DiPino told him that she had some "quarters" for sale and that he responded that he was "not into that."

bar and was standing somewhere in the vicinity of the board-walk and Wicomico Street with his friend, Frederick King. The area, according to DiPino, was populated with drug users, drug sellers, and "biker gangs." DiPino and Detective Brumbley had just left a bar where, in their undercover capacities, they had met with two "targets." When Davis saw DiPino and Brumbley, about ten feet away, he said something to King indicating that the women were police officers. Precisely what was said and how it was said were in dispute. According to DiPino and Brumbley, Davis said, in a voice loud enough for them to hear some nine to ten feet away, that they were "narcs," "undercover detectives," "undercover officers," or "undercover cops." Davis said that, upon spying the women, he told King, in a normal conversational tone, "[l]ook, those were the two girls that were going to come in last year and give me some pot and have Mr. Holtzman bust me, right?" When King asked if they were "narcs," Davis responded "I don't know what they are," that "[t]hey could be under cover or anything."

Whatever was said, DiPino believed that Davis made the statement in a voice loud enough to indicate to her an intent to "blow our covers." Although it appears that there was not a large crowd in the area, it being late at night, DiPino said that she noticed some "bikers" who gave them "dirty looks." Concerned for their safety, DiPino and Brumbley got into their car, left the area, and returned to the police station, without incident. There was no evidence that the particular "targets" they were pursuing that evening were still in the area when the comment was made or, if they were, that they overheard the remark; there was no evidence that Frederick King was a particular "target." DiPino believed, however, that "anybody that was standing out on the street was a potential ... target." She also believed that, by his loud statement to King, Davis had compromised her investigation, her ability to continue working undercover, and her safety, and that, as a result, he had committed some kind of crime, although she was unsure of what it was. She never contacted the State's Attorney's office to seek legal advice but instead conferred

with a District Court Commissioner, who informed her that Davis could be charged with "hindering."

Despite her immediate concerns, DiPino put the matter on the "back burner." She could have preferred charges against Davis at any time, but for two months she declined to do so. On July 5, 1991—during one of the busiest weekends in Ocean City—she applied to Commissioner Turner for a Statement of Charges against Davis. In her application, she stated that Davis had said to an unknown white male: "Look those two girls are narcs.... This statement was said in a loud enough voice as so the Det's, approx. 3 yds away, could hear and any passerby could also hear placing the Det's in extreme danger and compromising their cover." Upon that application, Commissioner Turner issued a warrant for Davis's arrest and a Statement of Charges charging Davis with two counts of the common law crime of obstructing and hindering, one count as to DiPino and one as to Brumbley. In each, Davis was charged with "intentionally and knowingly obstruct[ing] and hinder[ing] a police officer ... in the performance of the victim's lawful duties...." Pursuant to the arrest warrant, Davis was arrested at the Inlet Lodge on Saturday evening, July 6, 1991; in the presence of his customers, he was handcuffed and taken away. He was promptly presented before Commissioner Turner, who, despite Davis's established residence and employment in Ocean City, set bond at $50,000. Unable to post that bond immediately, Davis spent the next two nights in jail. On October 2, 1991, the day of his scheduled trial, the State entered a *nol pros* to both charges.

As noted, this action against DiPino, Turner, and the City was filed in December, 1991. The circuit court initially granted summary judgment in favor of all three defendants. On appeal, the Court of Special Appeals concluded that entry of summary judgment on the basis of the affidavits filed by the defendants was improper, but it affirmed the judgments on the alternative ground, raised by the appellate court on its own initiative, that the complaint filed by Davis failed to state any cause of action upon which relief could be granted. *Davis v. DiPino*, 99 Md.App. 282, 637 A.2d 475 (1994). We granted

*certiorari* and reversed the judgment of the Court of Special Appeals, holding that it was improper for that court to raise *sua sponte* the issue of the sufficiency of the complaint. We directed that the case be remanded to the circuit court for further proceedings. *Davis v. DiPino,* 337 Md. 642, 655 A.2d 401 (1995).

Upon the remand, Davis filed the amended complaint that is at issue now. In Count I, based on 42 U.S.C. § 1983, he alleged that, by filing a false application, with malice and without probable cause, DiPino violated various of his rights under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. He averred, among other things, that some of the allegations in her application were untrue and that no properly trained police officer could reasonably have believed that he had committed the crime of hindering. Count II charged DiPino with comparable violations of Articles 21, 24, 25, 26, and 40 of the Maryland Declaration of Rights. Count III claimed against the City, based on *respondeat superior,* for the State Constitutional violations alleged in Count II. Counts IV, V, and VI charged DiPino and the City with the common law torts of false imprisonment, malicious prosecution, and abuse of process. Count VII charged the City, under 42 U.S.C. § 1983, with failing to supervise DiPino and restrain her from unlawfully and maliciously harassing and arresting him and conspiring to violate his Constitutional rights. Counts VIII and IX purported to be class actions against Commissioner Turner under 42 U.S.C. § 1983 and the Maryland Declaration of Rights; they were founded on an alleged pattern by Turner of violating Maryland Rule 4–212(d)(1) by issuing arrest warrants rather than summonses. Substantial monetary damages were sought against DiPino and the City; as to Turner, only injunctive and declaratory relief and, in the § 1983 action, attorney's fees, were sought.

Turner moved to dismiss the actions against him on the ground that no cause of action was stated. That motion was granted. DiPino and the City answered the amended complaint, and, after a non-jury trial held on December 18, 1995,

the court concluded that DiPino had probable cause to believe that Davis had committed the crime of hindering. Believing that determination to be dispositive, the court did not address the free speech claim of Davis, the common law torts pled by him, the immunity defenses raised by DiPino and the City, or any alleged damages suffered by Davis. Upon the court's denial of his post-trial motion, Davis appealed the unfavorable verdicts.

After an *en banc* rehearing, the Court of Special Appeals, in a seven-to-six decision, (1) vacated the judgments in favor of DiPino on the Federal and State Constitutional claims (Counts I and II) and remanded for further proceedings; (2) vacated the judgments for DiPino and the City on the malicious prosecution claim (Count V) and remanded for further proceedings; (3) affirmed the judgments for DiPino on the other intentional tort claims (Counts IV and VI); (4) affirmed the judgments in favor of the City on the Federal and State Constitutional claims (Counts III and VII); and (5) affirmed the judgments in favor of Turner (Counts VIII and IX). *Davis v. DiPino*, 121 Md.App. 28, 708 A.2d 357 (1998). Those appellate judgments were based on a number of conclusions.

The Court of Special Appeals first held, on alternative grounds, that the circuit court erred in finding that DiPino had probable cause to procure Davis's arrest. Applying *Cover v. State*, 297 Md. 398, 466 A.2d 1276 (1983), the court noted that one of the elements of the crime of hindering was knowledge by the accused that a police officer was engaged in the performance of a duty, and it found no evidence in the record to support a finding that Davis reasonably believed that DiPino was engaged in the performance of police duties at the time he made his statement to King. Mere knowledge that the person allegedly hindered was a police officer does not suffice; there also must be knowledge that the officer was engaged in performing police duties when "hindered." *Davis v. DiPino, supra*, 121 Md.App. at 56–57, 708 A.2d at 371. Even if DiPino did entertain a reasonable belief that Davis knew that she was engaged in undercover work, the court added, Davis's statement to King did not constitute an *act* of

hindering: merely revealing an officer's status does not suffice as a hindering. Accordingly, the court concluded that DiPino had no reasonable basis for believing that Davis had committed the crime of hindering. Apart from the lack of probable cause, the appellate court determined that Davis had a First Amendment right to speak as he did, and that his arrest served to violate that Constitutional right. He did not make a false statement, incite lawless action, or jeopardize national security, and, the court concluded, there was no evidence that any bystanders, other than DiPino and Brumbley, even heard what Davis allegedly said to King.

It was upon those conclusions that the court vacated the judgments entered in favor of DiPino on the Federal and State Constitutional claims and remanded them for consideration of the immunity defenses that might be available to her. To guide the trial court on that immunity issue, the Court of Special Appeals concluded that (1) DiPino would have no immunity against compensatory damages for State Constitutional torts but would have immunity against punitive damages if she acted without malice; (2) the test for immunity on the § 1983 claim was whether it was objectively reasonable for DiPino to believe that her conduct did not violate a clearly established statutory or Constitutional right 'of which a reasonable person would have known; and (3) in that regard, (i) DiPino could have ascertained the elements of the crime of hindering and thus known whether Davis had committed that offense, prior to applying for a warrant, and (ii) DiPino would not necessarily be insulated from liability because the statements made in her application were true or because a judicial officer found probable cause to issue the warrant.

Though acknowledging that the City has no immunity under Maryland law from suits based on the violation of State Constitutional rights and that *respondeat superior* liability had been argued, albeit briefly, to the trial court, the Court of Special Appeals nonetheless affirmed the judgments in favor of the City on the ground that Davis had not properly raised the issue on appeal. In his brief, the court noted, Davis "presents, at best, only a glancing reference to Ocean City's

liability for any constitutional violations." *Id.* at 79, 708 A.2d at 382. Applying Maryland Rule 8–504(a)(5), which requires an appellate brief to include "[a]rgument in support of the party's position," the court held that Davis had waived his right to complain about the matter.[2]

The defendants' judgments on the three common law tort claims were apparently based on the trial court's conclusion that DiPino had probable cause to procure Davis's arrest. In light of the appellate court's disagreement on that point, those judgments could not stand on that basis. The judgments entered in favor of DiPino and the City on the false imprisonment and abuse of process claims were affirmed on other grounds, however. With respect to false imprisonment, the court held that, as DiPino did not carry out the arrest warrant, she did not deprive Davis of his liberty and, for that reason, was not liable for false imprisonment. Nor, it held, was there any evidence that DiPino made any illegal use of the warrant, after it was issued, for an ulterior motive, and, accordingly, she had not committed an abuse of process. The judgment entered on the malicious prosecution claims was vacated, however. Because the trial court acted solely upon a finding that DiPino had probable cause to seek the warrant, it never determined whether she acted with malice, and that determination, the appellate court held, was critical. The question of malice was important with respect to the City's liability as well. Because the malice required for malicious prosecution is different from the "actual malice" spoken of in the Local Government Tort Claims Act (Maryland Code, § 5–303(b) of the Courts and Judicial Proceedings Article) (LGCTA), the court concluded that the judgment for the City on the malicious prosecution claim was premature.

---

2. The Court of Special Appeals reached the same conclusion with respect to the § 1983 claim against the City. It noted that, under *Monell v. Department of Social Servs.*, 436 U.S. 658, 690–95, 98 S.Ct. 2018, 2035–38, 56 L.Ed.2d 611, 635–38 (1978), the City's liability on the § 1983 claim, if any, would be direct rather than derivative, but seemed to hold that any complaint about the judgment on that claim was also waived because of insufficient appellate argument.

Finally, the appellate court affirmed the judgment dismissing the actions against Commissioner Turner. As noted, those actions were based on the assertion that, under Maryland Rule 4-212(d)(1), Turner should have issued a summons, rather than a warrant, for Davis, that Turner routinely violated the Rule by issuing warrants rather than summonses, and that Davis was in jeopardy of further arrest because of likely future violations of the Rule by Turner. The Court of Special Appeals found Davis's fear of future harm to be entirely too speculative, and, on that ground, declared that the counts against Turner failed to state a cause of action for the relief sought.

None of the parties are entirely happy with the Court of Special Appeals decision. We granted the petition for *certiorari* filed by DiPino and the City to determine whether (1) DiPino had probable cause to believe that Davis had committed the crime of hindering; (2) her "truthful" application for a Statement of Charges violated his right to free expression; and (3) Davis produced sufficient evidence in support of his malicious prosecution claim to show that the arrest was not supported by probable cause and that DiPino acted with malice. We granted Davis's cross-petition to consider three other questions: (4) whether the Court of Special Appeals erred in affirming the judgments for the City on Davis's State Constitutional claims; (5) whether it erred in declining to reverse the judgment of the circuit court because of that court's admission of hearsay evidence; and (6) whether it erred in remanding for the resolution of immunity defenses, especially the claim of immunity regarding the State Constitutional torts.

## DISCUSSION

### Probable Cause—The Crime of Hindering

All of the actions filed against DiPino and the City depend, to some extent, on the averment that DiPino had no probable cause to believe that, by virtue of his remarks to Frederick King on May 11-12, 1991, Davis had committed the crime of

hindering. The judgments entered by the circuit court in favor of those defendants were based on the court's finding that DiPino did have such probable cause, and, as noted, it was in light of that finding that the court found it unnecessary to consider and rule upon any of the immunity defenses. If, as the Court of Special Appeals concluded, that finding was legally incorrect, those judgments that have no alternative foundation in the record cannot stand. Further proceedings would be required as to them. The probable cause question is therefore central to much of this case.

Probable cause, we have held, "is a nontechnical conception of a reasonable ground for belief of guilt." *Collins v. State*, 322 Md. 675, 679, 589 A.2d 479, 481 (1991); *Doering v. State*, 313 Md. 384, 403, 545 A.2d 1281, 1291 (1988). It is defined "in terms of facts and circumstances 'sufficient to warrant a prudent [person] in believing that the [suspect] had committed or was committing an offense.' " *Gerstein v. Pugh*, 420 U.S. 103, 111, 95 S.Ct. 854, 862, 43 L.Ed.2d 54, 64 (1975), quoting, in part, from *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964); *Collins v. State, supra*, 322 Md. at 679, 589 A.2d at 481; *State v. Smith*, 305 Md. 489, 515 n. 10, 505 A.2d 511, 524 n. 10 (1986), *cert. denied*, 476 U.S. 1186, 106 S.Ct. 2925, 91 L.Ed.2d 552 (1986). To determine whether an officer had probable cause, under that conception, the reviewing court necessarily must relate the information known to the officer to the elements of the offense that the officer believed was being or had been committed. The officer, of course, must undertake the same analysis in determining, in the first instance, whether the person may lawfully be arrested.

That analysis requires a proper understanding of the elements of the offense, in this instance hindering. We defined those elements in *Cover v. State, supra*, 297 Md. 398, 466 A.2d 1276. We noted there that, although the crime of hindering a police officer in the performance of the officer's duties was a statutory one in many States, it remained a common law crime in Maryland. Quoting from Lidstone, THE OFFENSE OF OBSTRUC-

TION: (2) OBSTRUCTING FREEDOM? [1983] Crim. L.Rev. 29, we observed that the offense comprised three different categories of conduct: (1) *positive direct obstruction,* in which the officer acts directly against the defendant or the defendant's property and is physically resisted; (2) *passive direct obstruction,* where the officer seeks to make the defendant act directly and the defendant refuses or fails to act as required; and (3) *positive indirect obstruction,* where "the police are not acting directly against the [defendant] but are acting indirectly against other citizens *who are, or may be, about to commit offenses* against the criminal law, and the [defendant] does an act which obstructs them in their general duty to prevent or detect crime, intending to frustrate the police operation." *Id.* at 405–06, 466 A.2d at 1280 (emphasis added).

In *Cover,* as here, the conduct at issue fell into the third category. Late at night, an undercover police officer, sitting in his car on a parking lot, was watching a man whom he thought might be preparing to break into a restaurant. The defendant, who, in the past, had often observed, accosted, and annoyed undercover officers, drove on to the parking lot, parked her car next to that of the officer, and turned off her lights. At some point, she started her car and turned on her headlights, as if preparing to leave. The officer went over to her, identified himself, explained that he was engaged in surveillance, and asked her to leave by a certain readily accessible route and not to exit by another route that might compromise his surveillance. She initially began to leave the area in the manner requested by the officer but then turned around and left by the other route. She drove slowly by the subject of the surveillance but apparently said nothing to him. At some point, a block away, she began honking her horn. When the officer searched for the suspect, he was gone. The defendant was charged and convicted of hindering. We reversed.

We determined that the offense of hindering comprises four elements:

"(1) A police officer engaged in the performance of a duty;

(2) An act, or perhaps an omission, by the accused which obstructs or hinders the officer in the performance of that duty;

(3) Knowledge by the accused of facts comprising element (1); and

(4) Intent to obstruct or hinder the officer by the act or omission constituting element (2)."

*Id.* at 413, 466 A.2d at 1284.

The difficult questions, we observed, arise in determining what constitutes a "duty" and what acts or omissions constitute obstructing or hindering the performance of the duty. With respect to the third category of the offense—passive indirect obstruction—we noted some division of authority as to whether there could be a hindering of an officer's performance of duty in the absence of evidence that the person or persons who were made aware of the officer's presence or status were then engaged in or were about to become engaged in criminal activity. For purposes of that case, we assumed, without deciding, that an officer's duty, in a surveillance situation, includes the surveillance of lawful, as well as unlawful, activity, *i.e.*, that it was not necessary, to constitute an unlawful hindrance or obstruction, that the person being observed be then engaged in criminal activity. We also assumed, for purposes of that case, that the offense included an act that deprived the officer "of the opportunity of seeing whether, in normal circumstances," the person being observed would commit a criminal act. Even under that broad reach of the offense, however, we concluded that Cover's conduct did not constitute hindering. Whatever Cover's intent may have been, it was merely speculative that her conduct had the effect of actually warning the suspect of the police presence. There was no evidence that the suspect heard the horn honking or, if he did, that he would have taken it as a warning. Accordingly, we held that "[c]ontrary to the implication of the State's argument, where the alleged hindering is as indirect as that presented here, we cannot conclude that the crime may be based solely on intent, without regard to whether there has in

fact been some degree of hindrance." *Id.* at 416, 466 A.2d at 1285.

Also illustrative is *In re Antoine H.*, 319 Md. 101, 108, 570 A.2d 1239, 1242 (1990). The police went to the home of one Howard to serve an arrest warrant. The respondents, two juveniles, were in the home when the police arrived. For about 10 minutes, they refused to open the door for the police and, when the police eventually gained access, they falsely denied that Howard was present. Howard, in fact, was hiding in the house. The respondents' recalcitrance and deception was alleged to constitute a hindrance and obstruction and formed the basis of a petition to declare the respondents juvenile delinquents. Reversing a finding of delinquency, we noted that the police, in fact, discovered Howard on the premises and effected the arrest, and, from that, we concluded that the respondents' conduct did not actually hinder the police.

DiPino based her assertion of hindrance on (1) the hypothesis that everyone then in the vicinity was a potential "target," and that Davis's remark would make it more difficult for her to arrange drug transactions with any of those persons, and (2) the "dirty looks" she received from a group of "bikers." The second ground may be quickly dismissed. Communications that are both intended and effective to place an officer, then in the performance of an official duty, in immediate jeopardy may very well form the basis of a charge of hindering. Even assuming that Officers DiPino and Brumbley were, in fact, in the performance of some official duty, however, there was utterly no evidence of either such an intent or such an effect in this case. No overt threats or hostile moves were made against the officers; none were encouraged by Davis; nor is there any basis in this record for a belief that Davis's remark to King, if overheard by others, would likely encourage any hostile action toward the officers. There is no indication from the setting that the officers were in harm's way. They were in a well-lit public area, and DiPino said that she was aware that there were other police officers

in the vicinity. Once the remark was made, they got into their car and left, uneventfully. The assertion in DiPino's application for a Statement of Charges that she was placed in "extreme danger" is entirely without foundation.

As noted, the Court of Special Appeals in this case focused not on whether DiPino and Brumbley were *in fact* engaged in the performance of a police duty but on whether DiPino reasonably could have suspected that Davis knew, when he made his remark, that they were so engaged. It "decline[d] to fashion a rule that one who knows a person is a police officer is automatically charged with knowledge that the police officer is acting in the performance of duty, regardless of what the officer is doing—whether the officer is in church, at the doctor's office, in a restaurant, at the movies, or lounging on the beach." *Davis v. DiPino, supra,* 121 Md.App. at 56, 708 A.2d at 371. We share that reluctance. As we pointed out in *Sawyer v. Humphries,* 322 Md. 247, 258–59, 587 A.2d 467, 472 (1991), "a police officer may be 'on duty' 24 hours a day in the sense that he may be on call and may under certain circumstances have an obligation to act in a law enforcement capacity even when on his own time. That does not, however, lead to the conclusion that the officer is always acting in furtherance of the State's business of law enforcement and that all conduct is incidental to police work." Davis simply saw two women, whom he suspected were police officers, on the street, apparently having just left a bar and preparing to get into their car. They were not talking with anyone, and they were not doing anything that might suggest to Davis or anyone else that they were engaged in police activity. In terms of their observed and observable conduct at the time, it was wholly unreasonable for DiPino to conclude, or even suspect, that Davis was aware that she and Brumbley were then and there engaged in the performance of an official duty.

Apart from Davis's knowledge, there is no evidence that DiPino and Brumbley were, in fact, engaged in the performance of police duties when the remark was made. DiPino's

complaint is that Davis interfered with her ability to engage in future "sting" operations with people whom she did not know and had no current reason to believe would participate in such ventures. The underpinning of her complaint is that one or more of those unknown people might be inclined to sell drugs but, because they were informed that she was a police officer, would refrain from dealing with her, thereby inhibiting her ability to detect criminal behavior. As we observed in *Cover*, there is some division of authority over whether the mere disclosure of an officer's identity to currently law-abiding people who might, in the future, be otherwise inclined to commit a violation constitutes a hindering of the officer in the performance of a duty, but even those cases sustaining a conviction do not extend the crime as far as DiPino would have us do.

A number of cases arose from speed traps, in which the defendant warned approaching motorists of the existence of the trap, and the views expressed in those cases are of interest. In *Bastable v. Little* [1907] 1 K.B. 59, two constables had marked a certain section of road and stationed themselves in order to time passing cars to detect speeders. The defendant warned approaching motorists, both orally and by signs, of the trap. All three justices of the King's Bench Division concluded that no crime had been committed. Two Justices— Alverstone and Darling—rested their decision on the lack of evidence that any of the motorists warned had, in fact, been speeding and thus on the premise that the warning had not prevented the officers from detecting any crime. Justice Ridley concluded that, to constitute unlawful hindering, there must be either a physical interference or threats, neither of which were shown to be present. In *Betts v. Stevens*, [1910] 1 K.B. 1, which also involved warnings given to motorists approaching a speed trap, the evidence indicated that some of the motorists were, indeed, speeding as they approached the trap, and that the warning caused them to slow down and thus avoid detection and proof of their unlawful conduct. Justices Alverstone and Darling distinguished that situation from the

one in *Bastable* and affirmed a conviction for hindering. Chief Justice Alverstone made clear the distinction:

> "[N]othing that I now say must be construed to mean that the mere giving of a warning to a passing car that the driver must look out as there is a police trap ahead will amount to an obstruction of the police in the execution of their duty in the absence of evidence that the car was going at an illegal speed at the time the warning was given; but where it is found, as in this case, that the cars were already breaking the law at the time of the warning, and that the act of the person giving the warning prevented the police from getting the only evidence which would be required for the purposes of the case, there I think the warning does amount to obstruction."

*Id.* at 7.

Justice Darling applied essentially the same distinction but as he had articulated it in *Bastable:* "[I]t is quite easy to distinguish the cases where a warning is given with the object of preventing the commission of a crime from the cases in which the crime is being committed and the warning is given in order that the commission of the crime may be suspended while there is danger of detection." *Id.* at 8. In *Warrensville Hts. v. Wason,* 50 Ohio App.2d 21, 361 N.E.2d 546 (1976), also a speed trap case, the Ohio court took a similar approach, noting, at 549:

> "It follows that one of the elements of obstruction is the presence of an illegal act which generates the policeman's duty to enforce the law. An additional element is interference with intent to impede the performance of that duty. In the present case it is conceded that the defendant did not warn persons who were violating the law. The drivers whom he signaled were not shown to be speeding. The officer was not proceeding, did not intend to proceed and did not have a basis for proceeding, against the persons warned."

*See also City of Akron v. Matteson,* 299 N.E.2d 315 (Ohio Mun.1972).

That same approach has been taken in other contexts. In *State v. Jelliffe*, 5 Ohio Misc.2d 20, 449 N.E.2d 810 (1982), the defendant, attending a rock concert, spotted someone in street clothes whom he recognized as a police officer. He was arrested when he told another person, in a voice loud enough to be heard by the officer, that the officer was "a cop." Entering a verdict of not guilty, the court noted:

> "[T]here is no allegation that defendant's conduct actually prevented the arrest of any persons who were then violating the law. While it may have made detection of violations more difficult, it is equally possible that it may have inhibited the commission of crimes in the first place. Surely that is one goal of law enforcement."

*Id.* at 811.

In *State v. CLR*, 40 Wash.App. 839, 700 P.2d 1195 (1985), a vice squad officer in a pickup truck approached a woman on the street. While talking to the officer through the driver's window, the woman agreed to engage in an act of prostitution. As the woman went around the truck and opened the passenger door, the defendant, standing across the street and observing the scene, but unable to hear the conversation, shouted "he's vice." The woman closed the door and started to walk away. Reversing the defendant's conviction for hindering, the court found that the officer was not hindered or delayed in making an arrest in that case. Although acknowledging that the officer's future undercover work may have been made more difficult by the exposure of his identity, the court nonetheless held the evidence insufficient, noting that other "[c]ourts have found that similar obstruction statutes do not apply where there was no obvious, contemporaneous, illegal activity when the warning was given." *Id.* at 1197.

Cases sustaining a conviction based on revealing the identity of an undercover officer usually have involved either a more direct interference or an expansive view of an officer's duty. In *People v. Robles*, 48 Cal.App. 4th Supp. 1, 56 Cal.Rptr.2d 369 (Cal.Super.1996), for example, a defendant who observed an undercover officer in the actual process of negotiating a

drug· sale with a street vendor, shouted to the seller, "Get away from that guy! The guy's a cop." When the vendor did not immediately depart, the defendant walked up to him and said, "I told you to get away from that guy. The guy's a cop." The seller then left without completing the sale. There being no dispute that the defendant knew that the officer was, in fact, a police officer, the court sustained a conviction for hindering, holding that the defendant's conduct "prevent[ed] the officer from obtaining evidence of a crime he might otherwise have obtained." *Id.* at 2, 56 Cal.Rptr.2d 369.

An English and a Canadian case turned on an expansive view of the officer's duty under the relevant statute. In *Hinchliffe v. Sheldon,* [1955] 3 A.E.R. 406, the defendant was the son of a tavern owner who arrived at the tavern, which was also his home, after 11:00 p.m., when, under the law, the tavern was supposed to be closed. He came upon some police officers outside the tavern. The son announced his presence and also warned that officers were outside. One of the officers knocked on the door, but the son again warned of the police. Eight minutes later, the police were admitted and, although they found a number of people inside, they found no evidence that the tavern had remained open for business after 11:00. The son was arrested and convicted of hindering.

Affirming the conviction, Lord Goddard, for the Queen's Bench Division, concluded that officers were authorized by the licensing statute to enter a licensed premises at any time for the purpose of preventing or detecting the commission of any offense against the statute, and that "[i]f they are detained from going in, that does obstruct them in the execution of their duty, because it gives the licensee, if he is committing an offence, the opportunity to get everything out of the way." *Id.* at 408. Police raids, he said, "should be done as quickly as possible without previous warnings being given, otherwise there might as well not be a raid." *Id.*

In the Canadian case—*Regina v. Westlie,* [1971] 2 W.W.R. 417—two plainclothes police officers were patrolling a "skid row" area of Vancouver looking for beggars who, under the

law, were regarded as vagrants. They had recently made an arrest that had been observed by the defendant, and they confided in the defendant that they were officers and were looking for beggars. The defendant went along with them as they patrolled the area, warning people that the two were officers. No vagrants were sighted, and the defendant was arrested and convicted for hindering. In affirming the conviction, the judges of the British Columbia Court of Appeal rejected the defense raised in *Bastable, supra,* that there could be no crime of hindering in the absence of evidence that criminal activity—specifically vagrancy—was occurring. They concluded, instead, that it was not necessary under the governing statute that an officer be engaged in the performance of a specific duty of detecting vagrancy at the time of the alleged offense. Judge Robertson noted that, if the sole duty of the officer at the time was to detect and arrest beggars, he might be inclined to accept the defendant's argument, but he concluded that officers had a more general statutory duty to preserve the peace and prevent the commission of *any* crime and that, had the officer, during his patrol, seen *any* criminal activity or anyone for whom there was an outstanding warrant, it would have been his duty to take action. That general duty, he concluded, was completely frustrated by the defendant's conduct. Judge Braca observed that, if the defendant had been doing no more than trying to prevent people from committing crimes, he too might find a lawful excuse, but he found that the defendant's intent was not to de*ter* crime but rather to de*fer* it—to encourage the beggars not to beg until the officers left the area.

These cases are distinguishable on a number of grounds, the most significant of which is that the officers involved were, in fact, engaged in a specific police operation when the defendant disclosed their identity, thereby frustrating their ability to carry out their assignment. In *Hinchliffe,* they were surveilling and attempting to enter a tavern after hours to see if it was in unlawful operation, which they had a statutory right to do. In *Westlie,* they were on patrol in a skid row area looking for vagrants (or other criminal activity). Here, there was no

evidence that DiPino and Brumbley were engaged in *any* police activity when Davis made his remark. They were not surveilling either an area or a particular group of people, but had, instead, completed an assignment and were on their way back to the police station. Neither *Hinchliffe* nor *Westlie* support the view that all of the people present within the officer's territorial jurisdiction are potential lawbreakers and that disclosure of the officer's identity to any of them may constitute a hindering. Whether an officer's duty be viewed broadly, as in *Westlie*, or more narrowly, there must at least be some evidence that the officer was performing a police duty when his or her identity was disclosed, and here there was none. For all of these reasons, we agree with the Court of Special Appeals that DiPino had no probable cause to believe that Davis had committed the crime of hindering by virtue of his remark to King.

That conclusion has a number of consequences. It requires that we consider, as the Court of Special Appeals did, whether there is any other basis for sustaining the judgments in favor of DiPino and the City. We need not consider, because the issues have not been raised in either petition for *certiorari*, whether the Court of Special Appeals erred in affirming (1) the dismissal of the claims against Commissioner Turner, and (2) the judgments in favor of DiPino and the City on the false imprisonment and abuse of process claims. Although the issues are not directly before us, as they were not decided by the trial court, we shall address the immunity defenses that might be available to DiPino and the City and the question of whether DiPino's conduct—effecting Davis's arrest because of the remark he made to King—violated his right of free speech under the First Amendment and Article 40. Those issues were addressed by the Court of Special Appeals, and it is important, on remand, that the trial court be guided by our view of them.

### *Immunities*

Five different kinds of claims remain open and will need to be addressed on remand. In Count I of the Amended Com-

plaint, grounded on § 1983, Davis charges that DiPino violated six different rights (or collection of rights) enjoyed by him under the United States Constitution: the right to free speech under the First and Fourteenth Amendments, the right to be free from unreasonable search and seizure under the Fourth and Fourteenth Amendments, the right to due process of law under the Fifth and Fourteenth Amendments, the right to notice, assistance of counsel, and jury trial under the Sixth and Fourteenth Amendments, the right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments, and the right to reasonable bail under the Eighth and Fourteenth Amendments.

In Count II, Davis charges DiPino with a violation of the parallel Constitutional rights afforded under the Maryland Declaration of Rights: the right to free speech under Article 40, the right to be free from unreasonable search and seizure under Article 26, the right to due process of law under Article 24, the right to notice, assistance of counsel, and jury trial under Article 21, and the right to reasonable bail and to be free from cruel and unusual punishment under Article 25.[3] Although in certain contexts the contours of the State Constitutional rights are not precisely those of the Federal—we have recognized some differences with regard to some of them—in the context presented here they are essentially the same. *See Freedman v. State,* 233 Md. 498, 197 A.2d 232 (1964), *rev'd on other grounds,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); *Jakanna v. Montgomery County,* 344 Md. 584, 689 A.2d 65 (1997) (the freedoms protected by Article 40 are co-extensive with those protected by the First Amendment); *Little v. State,* 300 Md. 485, 479 A.2d 903 (1984); *Gadson v. State,* 341 Md. 1, 668 A.2d 22 (1995) (Article 26 is *in pari materia* with the Fourth Amendment); *Lodowski v. State,* 307

---

**3.** We have considerable difficulty understanding how anything DiPino may have done constituted a violation of Davis's rights to notice, assistance of counsel, jury trial, reasonable bail, or to be free from cruel and unusual punishment under the Federal or State Constitutions, but those issues are not before us in this appeal. They can be dealt with by the circuit court on remand.

Md. 233, 513 A.2d 299 (1986); *Kirsch v. Prince George's County,* 331 Md. 89, 626 A.2d 372, *cert. denied,* 510 U.S. 1011, 114 S.Ct. 600, 126 L.Ed.2d 565 (1993) (construing due process and equal protection rights embodied in Article 24 *in pari materia* with comparable rights in Fifth and Fourteenth Amendments); *Ayre v. State,* 291 Md. 155, 433 A.2d 1150 (1981); *State v. Tichnell,* 306 Md. 428, 509 A.2d 1179, *cert. denied,* 479 U.S. 995, 107 S.Ct. 598, 93 L.Ed.2d 598 (1986); *Lodowski v. State. supra,* 307 Md. 233, 513 A.2d 299 (right to notice and assistance of counsel under Article 21 *in pari materia* with similar rights under Sixth Amendment); *Aravanis v. Somerset County,* 339 Md. 644, 664 A.2d 888 (1995), *cert. denied,* 516 U.S. 1115, 116 S.Ct. 916, 133 L.Ed.2d 846 (1996) (Article 25 *in pari materia* with Eighth Amendment).[4] The second claim, therefore, embodies parallel rights under the State Constitution that were allegedly transgressed by DiPino.

In Count III, Davis claims against the City, solely on a *respondeat superior* basis, for the State Constitutional violations allegedly committed by DiPino. No such claim is made by virtue of the Federal Constitutional rights allegedly violated by DiPino, because Davis acknowledges that a local governmental entity has no *respondeat superior* liability under § 1983. *See Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Ashton v. Brown,* 339 Md. 70, 112, 660 A.2d 447, 468 (1995). In Count VII, Davis does make a direct § 1983 claim against the City, based on the averment that, pursuant to official policy and custom, the City knowingly, recklessly, and with gross negligence failed to instruct, supervise, control, and discipline DiPino and prevent her from committing the wrong-

---

4. As we pointed out in *Attorney General v. Waldron,* 289 Md. 683, 714, 426 A.2d 929, 946 (1981), with respect to the right of equal protection of the law, Federal and State Constitutional provisions that are regarded as being *in pari materia* are nonetheless independent of each other, and a violation of one is not necessarily a violation of the other. There has been no argument here that the State provisions at issue should be interpreted differently than the relevant Federal counterparts.

ful conduct alleged. Finally, in Count V, Davis seeks damages from both DiPino and the City for the common law tort of malicious prosecution. Any liability of the City under that count would seem to be entirely vicarious.

Sorting out the potential liability of DiPino and the City with respect to these claims requires some analysis. One set of rules, themselves not easy to fathom, applies to the § 1983 claims in Counts I and VII. Those rules have been established by the United States Supreme Court as a matter of Federal law. A second set of rules applies to the State Constitutional claims. Notwithstanding that the Federal and State rights are essentially parallel, the rules relating to redress for the violation of those rights are very different. We have consistently declined to adopt the Federal approach. *Ritchie v. Donnelly,* 324 Md. 344, 597 A.2d 432 (1991); *Ashton v. Brown, supra,* 339 Md. 70, 660 A.2d 447. There is also the overlay of vicarious liability and the effect of the LGTCA on the State Constitutional claims and on the malicious prosecution claim.[5]

### *Section 1983*

Municipal police officers are "persons" under § 1983, and they may therefore be sued, both in their individual and official capacities, for violations of Federal Constitutional and statutory rights. Units of local government, such as the City, are also "persons" which may be sued under § 1983 although, as we noted, not on a *respondeat superior* basis. When a local governmental official is sued, the liability of the official and of the governmental entity depends, in part, on whether the official is sued in an official or a personal capacity. The

---

5. Further complicating the matter are the distinctions drawn, both as to § 1983 actions and actions to redress the violation of State Constitutional protections, between claims against the State or State officials and claims against a local governmental entity or its officials, not to mention claims arising from conduct or circumstances attributable to both State and local officials or entities or claims against Federal officials filed pursuant to *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). We deal here only with claims against a local governmental entity and a local government official.

distinction, and its ramifications, were set forth in *Kentucky v. Graham*, 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) and summarized by us in *Ashton v. Brown, supra*, 339 Md. 70, 660 A.2d 447 (1995).

A personal-capacity action seeks to establish personal liability on the part of the official for conduct committed under color of State law that causes the deprivation of a Federal right. If available under the facts of the case, the official may assert the good faith immunity defense set forth in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), *i.e.*, an objectively reasonable reliance on existing law. Because it is the personal conduct of the official that is alleged to be wrongful, rather than any governmental policy or custom, punitive damages are permissible in a personal-capacity action, but the plaintiff may look only to the personal assets of the official, and not to the entity, for the recovery of any damage award.

An official-capacity action may proceed only to the extent that the official's conduct "implement[s] governmental law, policy, or custom," *i.e.*, the deprivation underlying the § 1983 claim is "caused by a statute, regulation, policy or custom of the governmental entity" that the official was implementing. *Ashton v. Brown, supra*, 339 Md. at 111–12, 660 A.2d at 468. As the Court made clear in *Kentucky v. Graham, supra*, 473 U.S. at 166, 105 S.Ct. at 3105, 87 L.Ed.2d at 121, an official capacity action is really an action against the governmental entity, of which the official was merely an agent, and it lies when the entity itself was the "moving force" behind the deprivation, when its policy or custom played a part in the deprivation. The good faith immunity assertable in a personal-capacity action is not available in an official-capacity action, but the entity may defend by showing that "the official whose conduct is in question acted in a manner contrary to the policy or custom of the entity." *Johnson v. Board of County Com'rs for County of Fremont*, 85 F.3d 489, 493 (10th Cir.1996). Because in an official-capacity action it is the entity's policy that was wrongful and caused the harm, the

plaintiff may look only to the entity, and not to the assets of the official, to satisfy any damage award, at least when the entity receives notice of the action and has an opportunity to defend. Punitive damages are not allowed in an official-capacity action.

In this case, the language of the amended complaint is ambiguous as to whether DiPino is being sued in her personal or official capacity. Count I alleges that she was acting "in her capacity as a municipal police officer and as agent, serv-ant, and employee of the municipal Defendant." Count VII, against the City, alleges that DiPino was acting "under the direction and control" of the City; the gravamen of that claim, as noted, is that the City failed to supervise her and prevent her from committing the various wrongs alleged. Yet, in Count I, Davis seeks both compensatory and punitive damages against DiPino, which would not be allowed in an official-capacity action. The fact is, however, that an action against a local governmental official cannot be classified as official-capacity or personal-capacity "simply because of the labels used by the parties." *Ritchie v. Donnelly, supra,* 324 Md. at 361, 597 A.2d at 440. For purposes of the § 1983 claim, the court must determine from the evidence whether Officer DiPino was, in fact, implementing the policy or custom of the City when she caused the arrest of Davis, or whether she was acting on her own and not in conformance with City policy or custom. That, in turn, will determine whether any immunity is available, whether punitive damages are recoverable, and who bears the ultimate liability.

### Common Law Torts

Certain well-established rules apply to tort actions filed against local governments and their employees and offi-cials. A local governmental entity is liable for its torts if the tortious conduct occurs while the entity is acting in a private or proprietary capacity, but, unless its immunity is legislative-ly waived, it is immune from liability for tortious conduct committed while the entity is acting in a governmental capaci-ty. When acting in a private or proprietary context, the entity

also has *respondeat superior* liability for the tortious conduct of its employees. Because that liability is derivative, however, recovery may not be had against the entity if the employee is found not to be liable or is released. *See Katz v. Washington Sub. San. Comm'n,* 284 Md. 503, 397 A.2d 1027 (1979); *Austin v. City of Baltimore,* 286 Md. 51, 405 A.2d 255 (1979); *James v. Prince George's County,* 288 Md. 315, 418 A.2d 1173 (1980).[6] In this case, it is clear that DiPino's conduct was not committed in any private or proprietary capacity. In her capacity as a City police officer, she was purporting to enforce the State criminal law. That is quintessentially governmental in nature. There is, therefore, no *common law* liability on the part of the City.

 Certain local governmental employees may be immune from tort liability based on negligence, regardless of whether, from the entity's point of view, the function the employee is carrying out is governmental or proprietary. We summarized the law in that regard in *James v. Prince George's County, supra,* 288 Md. 315, 323-24, 418 A.2d 1173:

"Before a governmental representative in this State is relieved of liability for his negligent acts, it must be determined that the following independent factors *simultaneously* exist: (1) the individual actor, whose alleged conduct is at issue, is a *public official* rather than a mere *government employee or agent;* and (2) his tortious conduct occurred while he was performing *discretionary,* as opposed to *ministerial,* acts in furtherance of his official duties [citations omitted]. Once it is established that the individual is a public official *and* the tort was committed while performing a duty which involves the exercise of discretion, a qualified

---

6. In *James,* we determined that, if, tortious conduct is performed by a local government employee within the scope of employment and the entity does not have its own governmental immunity, it will be subject to suit without regard to any public official immunity possessed by the employee. *James, supra,* 288 Md. at 331, 418 A.2d at 1182. In reaching that conclusion, we overruled a contrary holding in *Bradshaw v. Prince George's County,* 284 Md. 294, 396 A.2d 255 (1979).

immunity attaches; namely, in the absence of malice, the individual involved is free from liability."

Those principles apply to negligent conduct, not to intentional conduct. In *Cox v. Prince George's County,* 296 Md. 162, 460 A.2d 1038 (1983), we made clear that a police officer, who might otherwise have the benefit of this immunity, does not enjoy it if the officer commits an intentional tort or acts with malice. It is clear, in this regard, that Officer DiPino was a public official acting in a discretionary capacity. *Clea v. Mayor and City Council of Baltimore,* 312 Md. 662, 673, 541 A.2d 1303, 1308 (1988). To determine whether she is entitled to common law governmental immunity, therefore, the court will have to determine whether her conduct was intentional or committed with actual malice.

Sitting atop of these principles is LGTCA. Under that Act, a local governmental entity is liable, up to $200,000 per person, $500,000 for all claims, for its own tortious conduct. It is also liable for tort judgments for compensatory damages rendered against its employees, if the judgment arises from tortious conduct committed within the scope of the employment. Under §§ 5–302(b) and 5–303(b) of the Courts and Judicial Proceedings Article, such a judgment, even though rendered against the employee, must be paid by the governmental entity. Unless the employee is found to have acted with actual malice, the plaintiff may not execute against the employee's assets. If the employee is found to have acted with actual malice, however, the judgment may be executed against the employee's assets, and the entity may seek indemnification for any sums it has paid, for compensatory damages, under § 5–303(b)(1). Section 5–303(e) adds that, in addition to any defense available to it under LGTCA, the entity "may assert on its own behalf any common law or statutory defense or immunity in existence as of June 30, 1987 [the effective date of LGTCA], and possessed by its employee for whose tortious act or omission the claim against the local government is premised and a local government may only be held liable to the extent that a judgment could have been rendered against such an employee under this subtitle." That provision re-

quires consideration of any common law governmental immunity DiPino may have.

### State Constitutional Claims

Although, as noted, the State Constitutional provisions allegedly violated here mirror, for the most part, the Federal provisions underlying the § 1983 action, different rules apply with respect to the remedies available for those violations.[7] In *Ashton v. Brown, supra,* 339 Md. at 100, 660 A.2d at 462, we noted that the right of recovery for Federal violations arises from statute—§ 1983—whereas the redress for State violations is through a common law action for damages. Indeed, we have characterized civil violations of State Constitutional protections as "constitutional torts," *id.* at 106, 660 A.2d at 465, which seems to be the common appellation now applied to them.[8] That would suggest that they be treated like other torts, with equivalent remedies, but we have declined to treat them precisely in that manner. We explained in *Clea v. City of Baltimore, supra,* 312 Md. at 662, 684–85, 541 A.2d 1303, 1314, that, unlike common law torts, which are designed generally to protect private persons from each other, Constitu-

---

**7.** For convenience, we shall speak in general terms when referring to State Constitutional violations. In most instances, as here, the alleged violations are of articles of the Declaration of Rights providing rights, protections, or guarantees similar to those afforded in the Federal Bill of Rights. We do not mean in any way to suggest that an action for damages lies for the violation of *all* provisions of the Constitution or Declaration of Rights; it may or may not, but that is not before us in this case. We are dealing here with claims under Articles 21, 24, 25, 26, and 40 of the Declaration of Rights.

**8.** In *Brown v. State,* 89 N.Y.2d 172, 652 N.Y.S.2d 223, 674 N.E.2d 1129, 1132 n. 2 (1996), the New York Court of Appeals noted that the term "constitutional tort" had been attributed to Professor Morris Shapo, citing Burnham, *Separating Constitutional and Common Law Torts: A Critique and a Proposed Constitutional Theory of Duty,* 73 MINN. L.REV. 515 n. 2. The court observed that the term "is now used generally by courts and commentators." *Brown, supra,* 652 N.Y.S.2d 223, 674 N.E.2d at 1132, and that appears to be the case. *See* T. Hunter Jefferson, *Constitutional Wrongs and Common Law Principles: The Case for the Recognition of State Constitutional Tort Actions against State Governments,* 50 VANDERBILT L.REV. 1525 (1997).

tional provisions have the more narrow focus of protecting citizens from certain unlawful acts committed by government officials. Indeed, only government agents can commit these kinds of Constitutional transgressions. Accordingly, we have applied more traditional principles for State Constitutional violations.

Unlike in a § 1983 action and unlike in an action for some common law torts, neither the local government official nor a local governmental entity has available any governmental immunity in an action based on rights protected by the State Constitution. *Clea v. City of Baltimore, supra,* 312 Md. 662, 541 A.2d 1303; *Ashton v. Brown, supra,* 339 Md. 70, 660 A.2d 447. Proof that the official acted in objectively reasonable reliance on existing law, which would exempt an official from liability under § 1983, may be relevant to whether the official committed a violation, but it does not provide an immunity should a violation be found. That is one major difference between the Federal and State jurisprudence; the personal/official capacity distinction applied in § 1983 actions is another. A third difference hinges on the existence of *respondeat superior* liability on the part of local governmental entities for State Constitutional violations. There is no such vicarious liability under § 1983, because of the distinction drawn between personal and official capacity actions.

Although we have consistently applied *respondeat superior* liability to local governmental entities for Constitutional violations committed by their officials, we have never actually articulated the doctrine in that context. The Court of Special Appeals has looked to a footnote in *Clea v. City of Baltimore, supra,* 312 Md. at 667–68 n. 3, 541 A.2d at 1305 n. 3, as indicating our acceptance of the doctrine. *See Port Deposit v. Petetit,* 113 Md.App. 401, 422–23, 688 A.2d 54, 65, *cert. denied,* 346 Md. 27, 694 A.2d 950 (1997); *Branch v. McGeeney,* 123 Md.App. 330, 718 A.2d 631 (1998). We shall now dispel any doubt in the matter and make clear, as a matter of common law, that local governmental entities do, indeed, have *respondeat superior* liability for civil damages

resulting from State Constitutional violations committed by their agents and employees within the scope of the employment.

Although most, if not all, of the 50 States have Constitutional provisions similar to those embodied in the First, Fourth, Fifth, Sixth, and Eighth Amendments to the U.S. Constitution, less than half have formally recognized a cause of action for civil damages for the violation of those provisions (*see* Jefferson, *Constitutional Wrongs and Common Law Principles: The Case for the Recognition of State Constitutional Tort Actions against State Governments, supra,* 50 VANDERBILT L.REV. at 1534–49; Gail Donoghue and Jonathan I. Edelstein, *Life after Brown: The Future of State Constitutional Tort Actions in New York,* 42 N.Y.L. SCH. L.REV. 447 n. 2 (1998)),[9] and only New York, to the best of our knowledge, has clearly addressed the issue of whether a governmental entity has *respondeat superior* liability for State Constitutional violations committed by its employees. In *Brown v. State, supra,* 89 N.Y.2d 172, 652 N.Y.S.2d 223, 674 N.E.2d 1129, the New York Court of Appeals concluded that *the State* should have the same vicarious liability for Constitutional torts as it has for common law torts committed by its employees. We assume, although the opinion did not address the subject, that the same rule would apply to local governments. The rationale for that holding was explained as follows:

> "The State is answerable for the conduct of its officers who commit common-law torts, such as assault and false imprisonment, even if they are joined with constitutional torts and there is no reason why, if constitutional torts are actionable, the State should not be similarly liable in the absence of a common-law tort.
>
> \* \* \* \*

---

**9.** According to Donoghue and Edelstein, New York, through its decision in *Brown v. State,* 89 N.Y.2d 172, 652 N.Y.S.2d 223, 674 N.E.2d 1129 (1996), became the twentieth State "to recognize a direct cause of action for damages based on violation of its state constitution." *Id.* at 447.

[T]he State is appropriately held answerable for the acts of its officers and employees because it can avoid such misconduct by adequate training and supervision and avoid its repetition by discharging or disciplining negligent or incompetent employees. Moreover, there is no reason why the deterrent value of holding the State answerable for an actionable assault by one of its employees is warranted but the deterrent value of holding it liable for an employee's constitutional tort is not."

*Id.* 652 N.Y.S.2d 223, 674 N.E.2d at 1142–43.

There have been cases in other States in which *respondeat superior* liability has been asserted, but, like *Clea v. City of Baltimore, supra,* each of them involved a situation in which the individual actor was held not to be the employee or agent of the entity, and the doctrine was found to be inapplicable on that basis. *See Moy v. County of Cook,* 159 Ill.2d 519, 203 Ill.Dec. 776, 640 N.E.2d 926 (1994); *Cashen v. Spann,* 125 N.J.Super. 386, 311 A.2d 192 (1973), *rev'd on other grounds,* 77 N.J. 138, 389 A.2d 969 (1978).

As a matter of common law, we can find no principled basis not to apply the doctrine of *respondeat superior* to State Constitutional violations for which a common law action for civil damages would lie. We adopt as our rationale—as our explanation for what we have consistently done—the view of the New York court in that regard. As we have indicated with respect to the common law torts, however, there is an interplay between *respondeat superior* and LGTCA, and, to the extent that LGTCA applies, it may assess and distribute liability differently than would be the case under strict application of *respondeat superior.* The extent to which any liability would fall against DiPino or the City may depend on how the trial court resolves the relevant factual issues.

### Right of Free Speech

Davis claims in Counts I and II that the prosecution commenced by DiPino violated his right to free speech, protected by the First Amendment and by Article 40. The "freedom of

individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Houston v. Hill,* 482 U.S. 451, 463–63, 107 S.Ct. 2502, 2510, 96 L.Ed.2d 398, 412–13 (1987). "[T]he First and Fourteenth Amendments [, however,] have never been thought to give absolute protection to every individual to speak whenever or whatever he pleases, or to use any form of address in any circumstances that he chooses." *Eanes v. State,* 318 Md. 436, 446, 569 A.2d 604, 608–09, *cert. denied,* 496 U.S. 938, 110 S.Ct. 3218, 110 L.Ed.2d 665 (1990). In *Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430, 434 (1969), the Supreme Court articulated the exception relevant to and governing this case, holding that speech "directed to inciting or producing imminent lawless action and [which] is likely to incite or produce such action" is unprotected.

As we have already indicated in our discussion of the crime of hindering, there is utterly no evidence in this record that Davis made his remark to King with the intent to incite or produce "imminent lawless action." Nor, under the circumstances, were his words likely to incite or produce any such action against DiPino or Brumbley. Clearly, they did not, in fact, incite any hostile action.

### *Malicious Prosecution*

In order to succeed in a claim for malicious prosecution, the plaintiff must show (1) that a criminal proceeding was instituted or continued by the defendant against the plaintiff, (2) that the proceeding terminated in favor of the plaintiff, (3) the absence of probable cause for the proceeding, and (4) malice, meaning that a primary purpose in instituting the proceeding was other than that of bringing the plaintiff to justice. *Montgomery Ward v. Wilson,* 339 Md. 701, 714, 664 A.2d 916, 922 (1995); *1000 Fleet v. Guerriero,* 346 Md. 29, 694 A.2d 952 (1997); *Exxon Corp. v. Kelly,* 281 Md. 689, 381 A.2d 1146 (1978). The circuit court found Davis's action wanting because of its finding that DiPino had probable cause to effect his arrest, which negated the third element of the tort. We

have concluded that DiPino did *not* have probable cause to effect the arrest. The Court of Special Appeals, reaching the same conclusion, remanded the action for a determination of (1) whether DiPino acted with the kind of malice necessary to constitute the tort, there being no dispute as to the first two elements, and (2) as to the City, whether she acted with the kind of actual malice that would preclude the City's liability under the Local Government Tort Claims Act.

Davis contends that the issue of malice was not properly before the Court of Special Appeals and is not properly before us, because it was not addressed by the trial court. He is wrong in that regard. As a substantive element of the tort of malicious prosecution, malice means that the defendant "was actuated by an improper motive," a purpose "other than that of bringing [the plaintiff] to justice." *Montgomery Ward v. Wilson, supra,* 339 Md. at 719, 664 A.2d at 925, citing or quoting in part from *Keys v. Chrysler Credit Corp.,* 303 Md. 397, 408 n. 7, 494 A.2d 200, 205 n. 7 (1985), and *Exxon Corp. v. Kelly, supra,* 281 Md. at 701, 381 A.2d at 1153. That kind of malice, though a separate element of the tort, may be inferred from the lack of probable cause. *Montgomery Ward, supra,* 339 Md. at 717, 664 A.2d at 924; *1000 Fleet v. Guerriero, supra,* 346 Md. at 37, 694 A.2d at 956.

The issue of probable cause clearly was a contested issue before the trial court, and it was only because of the court's negative finding on that element that it proceeded no further. On remand, the court will have to determine, by inference or otherwise, whether DiPino commenced a criminal prosecution against Davis for a motive or purpose other than to bring him to justice. If it concludes that DiPino had such an improper motive, it must then determine, apart from any damages sustained by Davis, whether she acted within the scope of her employment and with actual malice, other than that inferred solely from the absence of probable cause. In *Montgomery Ward, supra,* 339 Md. at 735–36, 664 A.2d at 933, we made clear that an award of punitive damages in a malicious prosecution case may not rest solely on an inference of malice

arising from the lack of probable cause, but must instead be based on proof of "heinous conduct, characterized by fraud, ill will, spite, evil motive, conscious wrongdoing, or intent to injure." That is the standard applicable under LGTCA as well. *Shoemaker v. Smith*, 353 Md. 143, 725 A.2d 549 (1999). Those findings, therefore, will determine whether, under LGTCA, DiPino or the City are ultimately liable for any damages.

### *Ocean City's Liability For Federal And State Constitutional Claims*

We have discussed above the considerations bearing on whether, and to what extent, the City may be liable for damages arising from Davis's claims under § 1983 and under the State Constitution. The Court of Special Appeals found it unnecessary to address the City's possible liability with respect to those claims on the ground that Davis had failed to preserve his complaint that the trial court erred in entering judgment for the City. The appellate court noted that Davis's brief presented "only a glancing reference to Ocean City's liability for any constitutional violations; virtually the entire discussion focuses on Officer DiPino," and it regarded that fleeting mention as insufficient to present an issue that the court was required to address. *Davis v. DiPino, supra,* 121 Md.App. at 79, 708 A.2d at 382. Davis complained about that ruling in his cross-petition for *certiorari*, and the issue is therefore before us.

It is true that, if a point germane to the appeal is not adequately raised in a party's brief, the court may, and ordinarily should, decline to address it. *Health Serv. Cost Rev. v. Lutheran Hosp.*, 298 Md. 651, 664, 472 A.2d 55, 61 (1984). Apart from the fact that Maryland Rule 8–504(a)(5) requires the brief to contain argument, it would normally be unfair to the other party for the court to rule adversely to that party on an issue that was not properly presented and on which the party therefore had no adequate opportunity to respond. In this case, however, we think that the Court of Special Appeals misapplied the rule.

The circuit court entered judgment for the City solely on the basis that Officer DiPino had probable cause to effect Davis's arrest and that, as a result, neither she nor the City violated any of his Federal or State Constitutional rights. The court made no finding particular to the City—that it had some immunity or was otherwise not responsible for wrongful conduct on the part of DiPino. The principal issues on appeal as to DiPino and the City were the same—whether, as a matter of State law, DiPino had probable cause to believe that Davis had committed the crime of hindering her in the enforcement of her police duties and, if so, whether Davis's remarks were nonetheless protected by the First Amendment. If, as occurred, the appellate court were to find for Davis on either of those issues, the case would have to be remanded for further proceedings as to both defendants. The judgment for the City was tied inextricably to the judgment for DiPino, both substantively and by virtue of the LGTCA, and it could not legitimately stand in the face of the court's ruling on the probable cause issue. To affirm that judgment after finding that it had no legal basis was inappropriate.

Ordinarily, in a situation such as this, we would remand the case for the Court of Special Appeals to address the unaddressed issue. There is no need to do so in this case, however. We have ruled upon the probable cause issue and offered guidance on the immunity issues. We shall vacate that part of the Court of Special Appeals judgment so that the circuit court, on remand, will have the entire case as to DiPino and the City before it.

### Evidentiary Issues

Davis raised a number of evidentiary issues before the Court of Special Appeals. One issue the court declined to address because it could not determine from the record extract the factual basis of Davis's complaint. Davis now complains that the court should have ordered him to correct the record extract. We disagree. The court did not abuse its discretion in this case in declining to address an issue for which an adequate basis is not found in the record extract.

As to a second issue, the court found no error, and that is not pursued. The third issue, arising from DiPino's testimony concerning her initial suspicions of Davis, the court found troubling, noting that much of the testimony "was based on rank hearsay, to which repeated objections were lodged." *Davis v. DiPino, supra,* 121 Md.App. at 87, 708 A.2d at 386. The court nonetheless decided, "given appellant's failure to particularize his contention or to provide a proper record extract" not to address the issue. *Id.* We also shall not address it, even though the intermediate court's ruling was raised in Davis's cross-petition. If that testimony is offered again on remand, the trial court will no doubt be guided by the concerns noted by the Court of Special Appeals and will give proper attention to the rules relating to hearsay evidence.

### *Conclusion*

For the reasons noted, we shall vacate that part of the Court of Special Appeals judgment affirming the judgment in favor of Ocean City on the Federal and State Constitutional claims, affirm the balance of that court's judgment, and direct that the case be remanded, once again, to the circuit court for further proceedings.

JUDGMENT OF COURT OF SPECIAL APPEALS AFFIRMING JUDGMENT IN FAVOR OF PETITIONER OCEAN CITY VACATED; JUDGMENT OF COURT OF SPECIAL APPEALS OTHERWISE AFFIRMED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REMAND TO CIRCUIT COURT FOR WORCESTER COUNTY FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION; COSTS IN THIS COURT AND IN COURT OF SPECIAL APPEALS TO BE PAID ¾ BY PETITIONERS DIPINO AND OCEAN CITY AND ¼ BY RESPONDENT DAVIS.