733 A.2d 351

**In re JASON ALLEN D.**

**No. 1457, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

July 12, 1999.

458

Daniel Q. Mahone, Frederick, for appellant.

Thomas K. Clancy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee.

Argued before HOLLANDER, SALMON and JOHN J. BISHOP (Retired, Specially assigned), JJ.

HOLLANDER, Judge.

In this case, we must determine whether the Circuit Court for Frederick County, sitting as a juvenile court, properly found that Jason Allen D., appellant, committed the offense of trespass, in violation of Md.Code (1957, 1996 Repl.Vol.), Art. 27, § 577, and the common law crime of resisting arrest. The charges stemmed from Jason's arrest on September 22, 1997, while he was on the grounds of the Sagner Housing Complex, owned by the Housing Authority of the City of Frederick (the "Housing Authority"). At the time of the incident, Jason was sixteen years old.

After the court found Jason delinquent, he was placed on supervised probation. Thereafter, Jason noted his appeal, and presents three issues for our consideration, which we have rephrased:

I. Was the evidence sufficient to sustain the trespass conviction?

II.   Is the trespass statute constitutional?

III.   Was the evidence sufficient to sustain the conviction for resisting arrest?

For the reasons that follow, we conclude that the evidence was insufficient to sustain the finding that appellant committed a trespass. Further, we shall vacate the finding of delinquency as to the offense of resisting arrest, and remand to the circuit court for a determination of whether appellant used excessive force.

### Factual Background

In an amended juvenile petition, the State alleged that, at approximately 9:10 p.m. on the evening of September 22, 1997, Jason "did enter upon the private land of the Frederick City Housing Authority known as the Sagner Housing Complex after having been duly notified not to do so on March 22, 1997...."[1] The petition also alleged that Jason unlawfully resisted the September 22, 1997 arrest. The matter proceeded to an adjudicatory hearing, at which several witnesses testified.

Theresa Ham, the Executive Director of the Housing Authority, testified that the Sagner complex is owned and operated by the Housing Authority as part of Frederick's public housing program. She explained that portions of the complex are designated as no-trespassing areas. In particular, Ham stated that a no-trespassing sign had been posted in front of 153 Pennsylvania Avenue, one of the buildings in the complex. Pursuant to a resolution passed by the Housing Authority Board of Commissioners in July 1994, members of the Frederick Police Department were authorized to enforce the no-trespassing laws on behalf of the Housing Authority.

Frederick City Police Officer John Fry testified that, at approximately 6:53 p.m. on the evening of November 28, 1996,

---

1. At trial, Officer John Fry testified that the first no-trespass notice was issued on November 28, 1996. Neither party comments on the discrepancy, but it appears to us that the petition seems to have the wrong date.

he "approached an individual [later identified as Jason] who was standing by 153 [Pennsylvania Avenue] along the sidewalk." Officer Fry "asked [Jason] if he resided on the property. . . ." When Jason said he did not, the officer called his dispatcher in order to determine if appellant's name had been added to the Housing Authority's "trespass log." The dispatcher informed Officer Fry that appellant's name was not listed on the log. Thereafter, Officer Fry issued a written notice to appellant stating that he "was not permitted on the property." [2] Officer Fry further stated that Jason signed the notice and acknowledged that he understood that he was not to return to the property.

On cross-examination, Officer Fry testified that when he issued the notice, Jason was just "standing there." No complaint of criminal activity had been lodged by any resident of the complex or by anyone else. Although Officer Fry did not know where appellant was coming from or where he was going, he issued the notice "simply because he was not a resident of Sagner." On re-direct, Officer Fry acknowledged that no-trespass notices are "issued to all individuals who are on the property of the Frederick Housing Authority who do not live there."

Officer Phillip Custead, also of the Frederick Police Department, testified that, on the evening of September 22, 1997, he arrested appellant twice for trespassing at Sagner. The second arrest is at issue here.

Turning to the first arrest, it occurred at 7:38 p.m., after Officer Custead was "dispatched to [the complex] for a trespass." The officer conceded that the first arrest did not occur on Sagner property, nor did he witness appellant commit any offense on the Sagner grounds. Nevertheless, Officer Custead arrested appellant "because he was instructed to do so by [his] Sergeant." After the officer transported Jason to the

---

**2.** The notice apparently was admitted in evidence as Exhibit 2, but we have been unable to locate the exhibits in the record.

police station, he was processed, released to his parents, and instructed not to return to Sagner.

Despite the officer's instruction to Jason, Officer Custead testified that, at 9:10 p.m., he was again dispatched to Sagner because he "was advised by dispatch that Jason [D.] had returned to the property and was harassing the security guards there." Appellant's counsel immediately objected to the officer's testimony. The court overruled the objection after the State said: "Your Honor, that's not for the truth of the matter asserted, only for the knowledge of the hearer in this case, it's why Officer Custead returned to the scene."

Officer Custead then described his second encounter with Jason:

THE PROSECUTOR: Officer Custead, upon returning back to the Sagner property did you happen to make contact with the respondent, [Jason]?

OFFICER CUSTEAD: Yes I did, I pulled into Sagner Drive and was met by a Watkins Security officer who then advised me of the situation again. And the two of us walked between the buildings over to Pennsylvania Avenue side of the complex.

* * *

THE PROSECUTOR: Could you please describe the area where the respondent was standing?

OFFICER CUSTEAD: The respondent was standing on the curb which was the property of the Housing Authority of the City of Frederick.

Officer Custead later testified that he observed appellant standing in close proximity to several other people. The officer did not know the identity of the people standing with Jason. Nor did he attempt to ascertain their relationship either to Jason or to the Sagner housing project. When backup officer David Armstrong arrived on the scene, Jason was advised that he was under arrest.

Appellant's counsel questioned Officer Custead about the circumstances of the second arrest. The following colloquy is relevant:

APPELLANT'S COUNSEL: When you went back [at the time of the second arrest] you went back for the specific purpose of arresting him . . . isn't that correct?

OFFICER CUSTEAD: I would have used my discretion when I got there, it was not a specific purpose to arrest him at that time, no.

APPELLANT'S COUNSEL: When you went back the second time you didn't go there to arrest him?

OFFICER CUSTEAD: If he had been on the property, yes.

APPELLANT'S COUNSEL: Okay. And once you saw him on the property it was clear you were going to arrest him at that point, right?

OFFICER CUSTEAD: That's correct.

APPELLANT'S COUNSEL: And were there other people standing in that area, Officer?

OFFICER CUSTEAD: Yes.

APPELLANT'S COUNSEL: Can you tell the Court how many folks were in that area?

OFFICER CUSTEAD: Probably five or six other people.

APPELLANT'S COUNSEL: Um-hmm. And was he standing in proximity to those persons?

OFFICER CUSTEAD: Yes he was.

APPELLANT'S COUNSEL: And do you know what the relationship of [Jason] was to those persons that he was standing with?

OFFICER CUSTEAD: No I do not.

\* \* \*

APPELLANT'S COUNSEL: . . . And so when you made the arrest why did you arrest him?

OFFICER CUSTEAD: He was trespassing on the Housing Authority's property after being duly notified not to do so.

APPELLANT'S COUNSEL: Do you know whether or not he was there at the invitation of any of the tenants?

OFFICER CUSTEAD: No.

APPELLANT'S COUNSEL: Did you make an inquiry, sir?

OFFICER CUSTEAD: No.

Later, on re-cross, the court did not allow appellant's counsel to ask Officer Custead whether, at the relevant time, Jason was doing anything illegal, "other than standing right there on [the] curb."

According to Officer Custead, when appellant was advised of his arrest, he "became argumentative and said you're not going to fucking arrest me, you [are] not going to fucking arrest me." When the officers asked appellant to put his hands behind his back, appellant refused. As Officers Custead and Armstrong attempted to handcuff Jason, appellant "pulled his arms into his stomach very tightly." Officer Custead testified that he and Armstrong then "took him to the ground." According to Officer Custead, appellant "continued to resist and pull away" and it took approximately one-and-one-half minutes to subdue him. Officer Custead testified that, after the arrest was accomplished, Jason "had a trickle of blood coming from his nose."

In the defense case, Ham was again called as a witness. During her testimony, Ham described the provisions of the Housing Authority's standard lease agreement, although no lease agreement was introduced into evidence. The following colloquy ensued:

APPELLANT'S COUNSEL: Now do the tenants, do you have a lease, a standard lease agreement with the tenants of the, respective of Housing Authority communities?

HAM: Yes.

APPELLANT'S COUNSEL: And is it correct to say that within the lease there's a provision which indicates that the tenants do have a right to have visitors?

HAM: Yes.

APPELLANT'S COUNSEL: And if someone is visiting a person on that property, that's a right pursuant to the contract between you, the Housing Authority, and the tenant?

HAM: Yes.

Ham further explained that the Housing Authority lease provides that "guests or visitors may be accommodated for a period up to two weeks." When defense counsel questioned Ham about the status of minors living in the complex, she did not assert that resident minors had no right to invite guests to Sagner. The following colloquy is pertinent:

APPELLANT'S COUNSEL: Now, with regard to the lease . . . when you rent a unit does the lease provide, or does the lease provide for every member of the household?

HAM: Every authorized member of the household is listed on the lease.

APPELLANT'S COUNSEL: Is on the lease. So those persons would have the same rights as the person who was actually paying the rent?

HAM: It's the adult member who's actually the party to the lease.

APPELLANT'S COUNSEL: Um-hmm. Okay, but the other individual, if they have children they're included on the lease as well?

HAM: They're listed as household members.

APPELLANT'S COUNSEL: And they too have a right to have guests?

HAM: I don't know if I can make that det, [sic] interpretation. The lease is between the listed tenant and the Housing Authority.

On cross-examination, Ham testified that, pursuant to Housing Authority policy, a non-resident who had received a no-trespass notice would not be allowed to return to Sagner, regardless of the lease provision regarding guests. In that event, a no-trespassing notice "supersedes" the lease provision. No written policy was introduced into evidence, howev-

er. Nor did Ham explain whether or how the Housing Authority informed its tenants of the policy, or how the Housing Authority made known to its tenants that a particular person was banned from the property due to receipt of a no-trespassing notice.

Brandon Morris, appellant's cousin, also testified on behalf of Jason. He stated that, on September 22, 1997, he lived at the Sagner complex with his mother and brothers. Moreover, Sagner had been his home for fourteen years. Nevertheless, the evidence did not reflect that Morris knew of the Housing Authority policy that automatically barred re-entry onto Sagner by any person who had received a no-trespassing notice.

Morris further testified that Jason is both his cousin and his friend, and Jason was at Sagner as Morris's guest when Jason was arrested. According to Morris, he and Jason, along with two other friends, were talking with one another when the police arrived. The following colloquy is pertinent:

APPELLANT'S COUNSEL: Now who else was standing on that corner if you recall?

MORRIS: You mean with us [referring to Morris and appellant]?

APPELLANT'S COUNSEL: Yeah, on that, on September 22nd when Officer Armstrong and Officer Custead came?

MORRIS: Me, Jason, Trevin and Shane.

APPELLANT'S COUNSEL: Okay, are all of you friends?

MORRIS: Um-hmm.

APPELLANT'S COUNSEL: And do you typically hang out there?

MORRIS: Yes.

APPELLANT'S COUNSEL: And was he [Jason] a guest of yours on that day?

MORRIS: Um-hmm.

Morris's description of Jason's arrest differed significantly from the version recounted by Officer Custead. Morris stated:

The cops walked up and was talking to one another, a security guard, then they walked over to him and started talking to him, then Officer Armstrong I think walked up to him and tried to grab his arms and say you're under arrest, but I don't think Jason saw him. Jason went like that, get off me. Then the guy came up behind him and kneed him in the stomach and started choking him. Then Jason spit out blood and passed out and then they dragged him to the other side of the cop car. That's all I saw.

Jason testified in his own behalf. He explained that he had resided at Sagner with his mother for approximately ten years, and had moved from the complex in 1996. Jason recounted that, on November 28, 1996, he was returning from a visit to his cousin's house [3] at 22 Sagner Court, when Officer Fry stopped him and gave him a no-trespass notice. Jason said:

I came out my cousin's house and I was on my way home, I walked up the steps and I saw a police car going up the hill, I saw the reverse lights come on and backed down the hill. And he stopped me, asked where I lived at, I said 203 Hope Circle, and he said I was trespassing and wrote me a citation. And I wouldn't sign it, and my cousin came out, and his mom. And she told me to sign it, so I just signed it. And I left.

Jason admitted that he had been served with another no-trespass notice almost a year later, during the early evening of September 22, 1997. But, the evidence did not reveal that Jason was aware of any Sagner lease provision or Housing Authority policy barring a non-tenant from ever entering the Sagner property because of such a notice. On cross-examination, Jason explained what he thought the no-trespass notice meant:

THE PROSECUTOR: Now Mr. [D.], you'd been served with a no trespass notice in 1996, you knew what that meant, right?

---

**3.** Jason did not specify the name of his cousin, but we assume he was referring to Brandon Morris.

APPELLANT: Yep.

THE PROSECUTOR: You knew that meant not to come back on the property?

APPELLANT: No, they said I could come over as long as I'm visiting somebody.

THE PROSECUTOR: And then you were told by Officer Custead that evening not to return to the property, you just heard your cousin say that, that you told him—

APPELLANT: No, he was down, my cousin wasn't at the police station with me. He told me and my father I could come back as long as I'm with somebody that lives over there.

THE PROSECUTOR: You heard Officer Custead testify today he told you that's not correct—

APPELLANT: But that ain't what he said.

THE PROSECUTOR: —he told you, excuse me?

APPELLANT: But he did not say that.

THE PROSECUTOR: Okay. So you're telling me that what you heard Officer Custead say on the stand that you were not back, permitted back on Sagner property is not correct?

APPELLANT: Yep.

THE PROSECUTOR: You're telling me that what Officer Fry said that you were not permitted back on the property at Sagner, is not correct?

APPELLANT: *He said long, Officer Custead and Officer Fry said I could come back as long as I was with somebody that lives over there.*

\* \* \*

*When he released me to my dad my dad asked him well am I allowed over there and he said as long as I'm with somebody that lives over there.*

(Emphasis added).

Additionally, appellant complained that when he was arrested on September 22, 1997, Officer Armstrong "grabbed his arms before he even said anything to [him]." Appellant

asserted: "I told him to get off me, I didn't know who it was, I ain't going to let nobody grab me."

At the conclusion of trial, appellant renewed his motion for acquittal, arguing, in part, that Jason had a right, under the Housing Authority lease, to be on the property as a guest of a tenant. In response, the State amplified its contention that the trespassing statute supersedes a tenant's right under the lease to invite guests onto the property. The following colloquy ensued:

THE PROSECUTOR: The law ... gives the Housing Authority special rights.

* * *

The Housing Authority has been given the right through [Art. 27, § ] 577 to regulate what goes on. And [Appellant's counsel] may be right and in the future the law may be that all residents on Frederick Housing Authority property have the right to invite and keep on and to have on their property at all times, regardless of what the Frederick Housing Authority wants.

* * *

I would submit to you that on the facts in this case that based upon the struggle for one and a half minutes and the fact that we have no testimony to rebut the same, that he was on Frederick Housing Authority property. And as the law remains right now, and as it was on that date, he had the right to be told to get off, although tenants may have the right, they are superseded by the Housing Authority's right to also ban people from that property. And in this case on that occasion that's what happened.

THE COURT: Well let me probe that a little bit—

* * *

I'm making this out of a whole thought, because none of this is before me, but I, it will help me to make a decision. This

young man has an aunt who lives in the premises, and the same facts, he's got this notice, and I'll say for the purposes of my hypothetical he has no connection with that at all, and he has a notice, but his aunt says come on over and I'm going to give you some milk and cookies, and he's walked to her house, and that's undisputed hypothetical, he's walking to her house and he's not at her door, he's on the sidewalk in the complex, but before getting to her door. Now can he be arrested for trespass—

\* \* \*

THE PROSECUTOR: I'm sorry, Your Honor. As the law is written he can. There, they, he was told on two separate occasions, do not come back to the property for any reason.
THE COURT: So clearly then your argument is that this notice supersedes any invitation or, he might receive?

\* \* \*

THE PROSECUTOR: Yes, yes.
Further, the court said:
   This case bothers me for a number of reasons.... I know this has further ramifications than my ruling.

\* \* \*

   I'm troubled by this because while [appellant's counsel] legitimately argues that one should look out for the rights of individuals as should be the case, nobody is looking out for the rights in this case, or at least I'm not hearing any arguments and I'm not criticizing, but the people who live in this, these projects can't plead their case. If it's a police state to arrest people who are on the premises who don't live there, what kind of a state is it, I guess it's an anarchist state when there can be no control of the premises. And that's the policy issue behind, that I was nattering on about the last time, behind this statute. And there are legitimate issues on both sides. And so the police get stuck out there,

try to do their jobs. They don't have a clue, because each time around they get ding-donged by whoever may be listed in the case, or these various interests. I am glad that there is a proceeding in effect that may clarify some of these things for all of us.

Here's how I'm going to handle this, and I do so reluctantly, I'm satisfied that there was authority in the police, I've said that, and I'm satisfied that notice was properly given. I'm also satisfied that Jason was in Sagner when the arrest occurred, and that he was hanging out with friends. And as far as the wantonness, there's no doubt in my mind that he was back there to, if there was ever a wanton trespass this is it. But what I'm not ready to rule on, and why I'm going to circle the wagons and take a pass for the moment, is that I am going to do some further review on this matter. . . . I'm not satisfied that I've done enough research or have enough background to be able to say that this article of § 2–577 supersedes the fundamental right of association. . . . I'm not even sure frankly how the right of association plays in this. So while it's unusual, and I truly reluctantly do it, I'm going to take this under advisement before I make a ruling.

In its Opinion and Order of June 19, 1998, the court concluded:

[T]he evidence shows that the respondent had proper notice that he was not to trespass in Sagner Complex, that he was in the Sagner Complex at the time of his arrest, and that he was in fact hanging out with his friends who live in the Sagner Complex.

Moreover, the court rejected appellant's constitutional claims, stating:

The Supreme Court has recognized the constitutional protection of freedom of association as to privacy interests and as to the expression of free speech or religious principals [sic]. However, the court is persuaded that any infringement of any minimal right of association of the respondent

in this case is not sufficient to invalidate the charge of trespass.

We will include additional facts in our discussion.

## Discussion

### I.   Sufficiency of the Evidence—Trespass

Appellant contends that the evidence was insufficient to establish that he committed the crime of trespass.   He offers four reasons to support his position.   First, appellant asserts that the State failed to prove that he was on property belonging to the Housing Authority at the time of the arrest. Second, appellant maintains that he had a bona fide claim of right to be on the property, because he was a "guest" or an "invitee" of his cousin, who resided at Sagner, and Officer Custead told him at the time of his first arrest on September 22, 1997, that he could return to the property so long as he was with a Sagner resident.   Third, appellant posits that the State failed to prove that his presence at Sagner was "wanton", because his activity on the premises was not " 'characterized by extreme recklessness and utter disregard for the rights of others.' "   *Griffin v. State*, 225 Md. 422, 171 A.2d 717 (1961), *rev'd on other grounds*, 378 U.S. 130, 84 S.Ct. 1770, 12 L.Ed.2d 754 (1964)(quoting *Dennis v. Baltimore Transit Co.*, 189 Md. 610, 616, 56 A.2d 813 (1948)).   Finally, citing *United States v. Grace*, 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983), appellant argues that the evidence was insufficient "under the First Amendment to the United States Constitution," because the sidewalk in front of 153 Pennsylvania Avenue is a "public forum," comparable to the sidewalk in front of the Supreme Court.

In reviewing a sufficiency claim, we must determine " 'whether after viewing the evidence in the light most favorable to the prosecution *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' "   *State v. Stanley*, 351 Md. 733, 749–50, 720 A.2d 323 (1998)(quoting *Bloodsworth v. State*, 307 Md. 164, 167, 512 A.2d 1056 (1986), in turn citing *Jackson v. Virginia*, 443 U.S.

307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)); *State v. Albrecht,* 336 Md. 475, 479, 649 A.2d 336 (1994); *Harcum v. State,* 121 Md.App. 507, 510, 710 A.2d 358 (1998); *Hagez v. State,* 110 Md.App. 194, 203, 676 A.2d 992 (1996); *Snyder v. State,* 104 Md.App. 533, 548–49, 657 A.2d 342, *cert. denied,* 340 Md. 216, 665 A.2d 1058 (1995). Weighing the credibility of the witnesses and resolving conflicts in the evidence are tasks left to the fact finder. *Stanley,* 351 Md. at 750, 720 A.2d 323; *Binnie v. State,* 321 Md. 572, 580, 583 A.2d 1037 (1991). Accordingly, our endeavor is not to determine if the verdict was in accord with the weight of the evidence, *Stanley,* 351 Md. at 750, 720 A.2d 323, but rather whether "the evidence, circumstantial or otherwise, and the inferences that can reasonably be drawn from the evidence, would be sufficient to convince a rational trier of fact, beyond a reasonable doubt, of the guilt of the accused." *Hagez,* 110 Md.App. at 204, 676 A.2d 992; *see Braxton v. State,* 123 Md.App. 599, 657, 720 A.2d 27 (1998).

▐█▌ The State initially argues that Jason's defense of a bona fide claim of right is not preserved because it was not asserted below. That argument is unavailing. Although the thrust of appellant's arguments below related to his constitutional right of association, we are satisfied that appellant adequately raised the issue of his bona fide status as a guest of a resident. In his motion for judgment of acquittal at the close of the State's case, Jason's attorney argued that the State had failed to show "that he was not legitimately on the premises." At the close of the evidence, appellant's attorney renewed the motion for judgment of acquittal, stating:

We have undisputed testimony that [Jason] was there as a visitor. They have a contract which says that the tenants have a right to have visitors of guests up to a two week period of time. Testimony says that's who he was with, he was with his friends, that he was invited there, and to do the things that people do, associating with people there. This is a right that he has. The right that the tenant has and a right that he has a guest to be there on those premises.

■ At the outset, we summarily reject appellant's first contention because, in the light most favorable to the State, the evidence established that the second arrest occurred when appellant was on the Sagner property. We turn to consider the substantive issues presented here with regard to the statutory offense of trespass, codified at Art. 27, § 577.

At the time of the adjudicatory hearing on May 28, 1998, the statute provided, in pertinent part: [4]

(a) *In general.*—(1) Any person who remains upon, enters upon or crosses the land, premises or private property ... of any person or persons in this State *after having been duly notified by the owner or his agent not to do so* is considered guilty of a misdemeanor, and on conviction is subject to a fine not exceeding $500, or imprisonment not exceeding 3 months, or both.

(2) The provisions of paragraph (1) of this subsection shall apply to property used as a housing project and operated by a housing authority or by another State public body, as those terms are defined under Article 44A of the Code, if a duly authorized agent of the housing authority or other State public body gives the required notification specified in paragraph (1) of this subsection.

(3) This section may not be construed to include within its provisions the entry upon or crossing over any land *where such entry or crossing is done under a bona fide claim of right or ownership of said land, it being the intention of this section only to prohibit any wanton trespass upon the private land of others.*

(Emphasis added).

Appellant's second and third arguments, largely rooted in Art. 27, § 577(a)(3), are essentially two sides of the same coin.

---

4. The Legislature subsequently repealed Art. 27, § 577, and replaced it with a new statute, effective October 1, 1998. The new statute consolidated the trespass provisions previously codified in Article 27, §§ 576, 577, 578, 579A, 579B, and 580. *See* 1998 Md. Laws, Chap. 498, Art. 27, § 577. The provision at issue in this appeal was enacted without substantive change.

Section 577(a)(3) excludes from the statute's purview those situations when a person enters on property of another "under a bona fide claim of right . . . .", and makes clear that conduct amounts to trespass only if it is "wanton." Thus, the concept of "wanton" appears inextricably linked to the question of whether the accused trespasser had a "bona fide claim of right" with respect to the property at issue. Stated otherwise, it would seem that a trespass cannot be "wanton" if the alleged trespasser had a "bona fide claim of right" to enter onto the property.

■■■■ Construction of the statutory terms "bona fide" and "wanton" is our starting point. " 'The cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature.' " *Board of License Commissioners for Charles County v. Toye*, 354 Md. 116, 122, 729 A.2d 407, 410 (1999) (quoting *Oaks v. Connors*, 339 Md. 24, 35, 660 A.2d 423 (1995)); *see also Roberts v. Total Health Care, Inc.*, 349 Md. 499, 523, 709 A.2d 142 (1998); *McGraw v. Loyola Ford, Inc.*, 124 Md.App. 560, 592, 723 A.2d 502, *cert. denied*, 353 Md. 473, 727 A.2d 382 (1999). The statutory language is the primary source for ascertaining the Legislature's intent. *Catonsville Nursing Home, Inc. v. Loveman*, 349 Md. 560, 570, 709 A.2d 749 (1998); *Allied Vending, Inc. v. City of Bowie*, 332 Md. 279, 306, 631 A.2d 77 (1993). "[W]here the statutory language is plain and free from ambiguity, and expresses a definite and simple meaning, courts normally do not look beyond the words of the statute itself to determine legislative intent." *Toye*, at 122, 729 A.2d at 410.

■■■■ In order to ascertain the Legislature's intent, "the Court considers the language of an enactment and gives that language its natural and ordinary meaning." *Montgomery County v. Buckman*, 333 Md. 516, 523, 636 A.2d 448 (1994); *see Lewis v. State*, 348 Md. 648, 653, 705 A.2d 1128 (1998); *Chesapeake and Potomac Tel. Co. v. Dir. of Fin.*, 343 Md. 567, 578, 683 A.2d 512 (1996); *McGraw*, 124 Md.App. at 592, 723 A.2d 502; *Carroll County Ethics Comm'n v. Lennon*, 119 Md.App. 49, 67, 703 A.2d 1338 (1998). Moreover, we endeavor

to "avoid constructions that are illogical, unreasonable, or inconsistent with common sense." *Degren v. State,* 352 Md. 400, 417, 722 A.2d 887 (1998); *Lewis v. State,* 348 Md. 648, 654, 705 A.2d 1128 (1998); *Frost v. State,* 336 Md. 125, 137, 647 A.2d 106 (1994).

■ Black's Law Dictionary defines the term "bona fide" as "[i]n or with good faith; honestly, openly, and sincerely; without deceit or fraud." *Black's Law Dictionary* 177 (6th ed.1990); *see Ashton v. Brown,* 339 Md. 70, 91, 660 A.2d 447 (1995)(referring to Black's Law Dictionary in interpreting the phrase "bona fide organization"). In *Griffin,* 225 Md. at 429, 171 A.2d 717, the Court defined the term "wanton" in Art. 27, § 577:

> Although there are almost as many legal definitions of the word "wanton" as there are appellate courts, we think the Maryland definition, which is in line with the general definition of the word in other jurisdictions, is as good as any. In *Dennis v. Baltimore Transit Co.,* 1948, 189 Md. 610, 56 A.2d 813, 817, as well as in *Baltimore Transit Co. v. Faulkner,* 1941, 179 Md. 598, 20 A.2d 485, it was said that the word "wanton" means "characterized by extreme recklessness and utter disregard for the rights of others."

The unambiguous statutory language is consistent with the history of the statute. At common law, "[t]respass to private property is not a crime ... unless it is accompanied by, or tends to create, a breach of the peace." *Griffin v. State,* 225 Md. at 428, 171 A.2d 717; *see In Re Appeal No. 631,* 282 Md. 223, 226, 383 A.2d 684 (1977)(collecting cases). Thus, "criminal trespass is for the most part a statutory creation." *In Re Appeal No. 631,* 282 Md. at 226, 383 A.2d 684. When Blackstone catalogued criminal "Offences Against Private Property" in his *Commentaries on the Laws of England,* he did not include the crime of trespass; he limited his discussion to the crimes of larceny, malicious mischief, and forgery. *See* 4 William Blackstone, *Commentaries on the Laws of England* 229–247 (1768).

What is now Art. 27, § 577 was originally enacted by the General Assembly in 1900, and codified at Art. 27, § 21A of the 1888 Code. *See* 1900 Md. Laws, Chap. 66. Of particular importance here, the original manifestation of Maryland's trespassing statute contained language virtually identical to that now found in Art. 27, § 577(a)(3). The 1900 Act read as follows:

Any person or persons who shall enter upon or cross over the land, premises or private property of any person or persons in this State after having been duly notified by the owner or his agent not to do so, shall be deemed guilty of a misdemeanor, and on conviction thereof before some justice of the peace in the county or city where such trespass may have been committed, be fined by said justice of the peace not less than one nor more than one hundred dollars, and shall stand committed to the jail of said county or city until such fine and costs are paid; provided, however, that the person or persons so convicted shall have the right to appeal from the judgment of said justice of the peace to the Circuit Court of the county or city where such trespass was committed, at any time within ten days after such judgment is rendered; and provided, further, that *nothing in this Act shall be construed to include within its provision the entry upon or crossing over any land where such entry or crossing is done under a bona fide claim of right or ownership of said land, it being the intention of this Act only to prohibit wilful and wanton trespass upon the private land of others.*

1990 Md. Laws, Chap. 66 (emphasis added).

The statute's requirement that the putative trespasser's conduct be "wanton" stands in marked contrast to the tort of trespass. In *Baltimore Gas and Elec. Co. v. Flippo*, 348 Md. 680, 690–91, 705 A.2d 1144 (1998), the Court of Appeals said:

It is a well-settled rule in this State that an action for trespass to real property may be maintained "whether the defendant committed the trespass unwittingly ... or willfully and wantonly." *Atlantic [& George's Creek Consol.] Coal Co. [v. Maryland Coal Co.]*, 62 Md. [135] at 143 [(1884)] (noting that a trespass is committed even when a trespasser makes a mistake regarding the title or boundaries of his

land and mines coal on an adjoining neighbor's property thinking he is on his own property); *see also Gore [v. Jarrett],* 192 Md. [513] at 516, 64 A.2d [550] at 551 [(1949)] (noting that a trespass may be committed unwittingly by a person who believes he or she has title to land); *Barton Coal Co. [v. Cox],* 39 Md. [1] at 29–30 [(1873)] (noting that every trespass is an injury whether willful or not even if the defendant honestly believed it was mining its own coal and inadvertently committed a trespass); *Scott [v. Bay],* 3 Md. [431] at 443 [(1853)] (noting that trespass was the proper remedy where the defendant had blasted rocks on his property causing rocks to be thrown onto the premises of the plaintiff and that it was immaterial whether the defendant committed the act willfully or not).

Thus, in a civil context, "[e]very un-authorized entry upon the property of another is a trespass which entitles the owner to a verdict for some damages." *Patapsco Loan Co. v. Hobbs,* 129 Md. 9, 15, 98 A. 239 (1916)(quoting *Gusdorff v. Duncan,* 94 Md. 160, 169, 50 A. 574 (1901)). Prosser and Keeton explain further:

The intent required as a basis for liability as a trespasser is simply an intent to be at the place on the land where the trespass allegedly occurred. The distinction to be made is between accidental and intentional entries.

\* \* \*

The defendant is liable for an intentional entry although he has acted in good faith, under the mistaken belief, however reasonable, that he is committing no wrong. Thus, he is a trespasser although he believes that the land is his own, or that he has the consent of the owner, or the legal privilege of entry; or although the defendant is a child too young to understand that what he is doing is wrong. The interest of the landowner is protected at the expense of those who make innocent mistakes.

W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts,* § 13 at 73, 74–75 (5th ed.1984).

Surely, more is required in the criminal arena. The General Assembly's original use of the term "wilful and wanton" indicates to us that the offense of misdemeanor trespass was meant to be a general intent crime that is not coextensive with conduct actionable in tort. The language of Art. 27, § 577(a)(3), crafted nearly a century ago, foreshadowed a statement from the Model Penal Code regarding the mental intent element of criminal trespass, quoted with approval in *Warfield v. State*, 315 Md. 474, 554 A.2d 1238 (1989):

> The knowledge requirement is designed primarily to exclude from criminal liability both the inadvertent trespasser and the trespasser who believes that he has received an express or implied permission to enter or remain.

*Warfield*, 315 Md. at 499, 554 A.2d 1238 (quoting 2 Model Penal Code and Commentaries § 221.2 comment (2)(a), at 88 (1980)). *See Green v. State*, 119 Md.App. 547, 559-60, 705 A.2d 133 (1998).

Applying the plain meaning of the terms "wanton" and "bona fide" to the facts of this case, and considering the origin of the statute, we are satisfied that Jason had a bona fide claim of right to enter Sagner as a guest of a resident, and thus he did not act wantonly. We explain further.

At the time of the second arrest, Officer Custead primarily focused on Jason's presence on the Sagner property. Officer Custead admitted that when he was dispatched to Sagner for the second time on September 22, 1997, he planned to arrest Jason if he was "on the property." Further, it appears to us that appellant was found to have committed a trespass based on the following: 1) Jason was present on the Sagner property; 2) he was not a resident of Sagner; 3) Jason received a no-trespassing notice based on an earlier arrest on the same night.

Even in the light most favorable to the State, the uncontroverted evidence established that, at the time of the second arrest, Jason was at Sagner with his cousin, Brandon Morris, a current and long-time resident of Sagner. Indeed, in its written opinion, the court found that "the evidence shows that

[Jason] . . . was in fact hanging out with his friends *who live in the Sagner complex.*" (Emphasis added). Moreover, the State never disputed that Jason's relative had invited him to Sagner. Nor did the State assert that the invitation was an after-the-fact attempt to defeat the trespass charge. Rather, the State argued that Morris's invitation was ineffective to confer bona fide status upon Jason, either because Morris was a minor, or because a tenant's right to invite a social guest is superseded by the Housing Authority's right to exclude non-residents.

Although appellant returned to Sagner less than two hours after his first arrest for trespassing, the validity of the first arrest is questionable because, as Officer Custead virtually admitted, appellant was not actually trespassing the first time. Moreover, the Housing Authority lease provided that tenants were entitled to have guests, and it did not specifically prohibit children of lessors from inviting their friends to the property. Nor was there evidence that either Brandon or Jason knew of the automatic bar that supposedly applied, by "policy", to any person who received a no-trespass notice. Thus, Jason held an objectively reasonable belief that he was allowed to return to the housing complex "as long as [he was] visiting somebody."

In reaching our decision that the State's evidence was legally insufficient, the recent cases of *Green v. State*, 119 Md.App. 547, 705 A.2d 133, and *Herd v. State*, 125 Md.App. 77, 724 A.2d 693 (1999), are noteworthy. Each concerned the offense of fourth degree burglary, Md.Code (1957, 1996 Repl. Vol.), Art. 27, § 32(a)(1) and (2), which includes the former statutory misdemeanor crimes of breaking and entering "the dwelling house of another", and "storehouse" breaking and entering. The Court of Appeals has described those crimes as "forms of criminal trespass." *Warfield*, 315 Md. at 498, 554 A.2d 1238.

In *Green*, we considered whether a person charged with fourth degree burglary under Art. 27, § 32(a)(2) was entitled to a jury instruction concerning his defense that "he reason-

ably believed he had implied permission" to enter the home he was accused of burglarizing. *Id.* at 557, 705 A.2d 133. Based on the facts generated by the defense, we held that Green was entitled to the requested instruction, in part because criminal trespass is a general intent crime. We noted that in *Warfield, supra*, 315 Md. 474, 554 A.2d 1238, the Court had rejected the view that trespass is a strict liability offense. *Green*, 119 Md.App. at 559, 705 A.2d 133. Moreover, we recognized that "there are situations when a person intentionally enters the property of another, based on a *reasonable* belief that it is permissible to do so. In that circumstance, one is not necessarily criminally culpable, notwithstanding the actual intent to enter." *Id.* at 560, 705 A.2d 133. (Emphasis added). Further, we explained:

> In order to be guilty of criminal trespass, even when one *intends* to enter the property of another, the *Warfield* Court made clear that one must be "aware of the fact that he is making an unwarranted intrusion." *Id.* at 498, 554 A.2d 1238.

\* \* \*

It follows that, in a prosecution for criminal trespass, "it is an affirmative defense . . . if 'the actor reasonably believed that the owner of the premises . . . would have licensed him to enter. . . .'" *Id.* (Quoting 2 Model Penal Code and Commentaries § 221.2(3)(c), at 144). Consequently, a defendant is not culpable if his "belief is reasonable, that is, a belief [that] is not reckless or negligent. . . ." *Id. See* Model Penal Code and Commentaries § 221.2, comment (2)(a), at 88. What the Court said in *Warfield* [315 Md. at 500, 554 A.2d 1238] is noteworthy here:

> [T]he [L]egislature intended that the intrusion, to be culpable, [must] be with an awareness that it was unwarranted—lacking authority, license, privilege, invitation, or legality. *To make culpable the inadvertent trespasser and the trespasser who entertains a reasonable belief that his conduct was proper would be unreasonable, illogical,*

*inconsistent with common sense, and contrary to the interests of justice.*

*Green,* 119 Md.App. at 560, 705 A.2d 133.

In *Herd,* 125 Md.App. 77, 724 A.2d 693, we confronted several questions regarding the offense of fourth degree burglary. There, a licensed bail bondsman was convicted of fourth degree burglary when he and two of his colleagues forcibly broke the lock on the front door of a home and entered the dwelling in search of a fugitive. Although the defendant conceded that he acted without a warrant, he contended that he reasonably believed he was entitled to enter the property. *Id.* at 80, 724 A.2d 693. Writing for this Court, Judge Moylan framed two of the appellate issues as follows:

1) What precisely is the *mens rea* of fourth-degree burglary and what is the impact on that *mens rea* of a defendant's reasonable belief that he was entitled to make the intrusion in question?

2) With respect to such reasonable belief (or the absence thereof), to which party is allocated 1) the burden of initial production, 2) the burden of ultimate persuasion, and 3) what is the level of persuasion that must be satisfied by the party carrying that burden?

*Id.* at 81, 724 A.2d 693.

Our resolution of those issues shines considerable light on the nature of the bona fide claim of right provision contained in Art. 27, § 577. In answer to the first question, we reiterated that Art. 27, § 32(a)(1) is not a specific intent crime. Further, we said:

The general intent to effectuate the *actus reus* of the trespass, however, includes an awareness that the trespass is unwarranted. *Thus, a reasonable belief that the trespass is authorized, licensed, or privileged is a complete defense to the crime.*

*Id.* at 93, 724 A.2d 693 (emphasis added).

In allocating the burdens of production and persuasion as to the defense of reasonable belief, Judge Moylan also explained:

In cases charging the fourth-degree burglary of a structure, the defense that the alleged intruder reasonably believed he was entitled to make the intrusion is relatively rare. For reasons already fully discussed, we hold that there is no burden on the State to disprove, in a vacuum, the existence of such a reasonable belief. The State enjoys the benefit of a Thayer–Wigmore presumption that an intruder does not possess such a reasonable belief. If that presumption is unrebutted, no issue in that regard will be submitted to the jury.

Because, however, it is part of the *mens rea* of the crime that the intruder be aware that the intrusion is unwarranted, *Warfield v. State,* 315 Md. 474, 500, 554 A.2d 1238 (1989), it would be unconstitutional to treat the defense as a classic affirmative defense and to impose on the defendant the burden of ultimate persuasion with respect to his reasonable belief in that regard.... *Warfield* makes it clear that the awareness that an intrusion is unwarranted is a mental element necessary to constitute the offense of fourth-degree burglary of a structure:

[W]e are satisfied that the legislature intended that the intrusion, to be culpable, be with an awareness that it was unwarranted—lacking authority, license, privilege, invitation, or legality. 315 Md. at 500, 554 A.2d 1238.

*When, therefore, the defendant meets his burden of production by generating a genuine jury issue as to his reasonable belief that the intrusion was warranted, the Thayer–Wigmore presumption is dissipated—the bubble bursts—and the State assumes the burden of persuading the fact finder beyond a reasonable doubt as to the absence of such a reasonable belief.*

*Herd,* 125 Md.App. at 103–04, 724 A.2d 693 (emphasis added).

In applying the principles outlined above, we summarized the *mens rea* of fourth degree burglary:

When closely parsed, the *mens rea* of the fourth-degree burglary ... consists of two parts. It is a complete defense to fourth-degree burglary if there remains a genuine possi-

bility, not disproved beyond a reasonable doubt, of **BOTH** 1) a subjective belief by the defendant that the intrusion was warranted **AND ALSO** 2) the objective reasonableness of such a belief. The State may thus meet its burden of disproving such an exculpatory state of mind by persuading the fact finder **EITHER** that the defendant did not actually entertain such a subjective belief **OR** that such a belief, even if entertained, was objectively unreasonable.

*Id.* at 108, 724 A.2d 693. We concluded in that case that the trial court correctly allocated each burden. We agreed, in particular, that despite the sincerity of the bail bondsman's belief, the State met its burden to disprove the reasonableness of that belief. *Id.* at 108–09, 724 A.2d 693.

We perceive no meaningful distinction between the allocation of the burdens of production and persuasion with regard to trespassing in Art. 27, § 577, and the trespassing crimes discussed in *Herd* and *Green*. We are convinced, therefore, that in the case *sub judice,* Jason had the burden of generating a bona fide claim of right defense, and he met that burden. Thereafter, the burden of persuasion shifted to the State to convince the juvenile court, beyond a reasonable doubt, that Jason lacked a bona fide claim of right. As we see it, the State failed to shoulder that burden.[5]

As we noted, the State never contested Jason's claim that Brandon invited him as a social guest to Sagner. Moreover, although the land in issue was privately owned by the Housing Authority, a visitor who believed he was lawfully invited to Sagner could reasonably perceive the sidewalk in front of 153 Pennsylvania Avenue as a "public" thoroughfare. *Cf. Davis v. DiPino,* 121 Md.App. 28, 70, 708 A.2d 357 (1998)(observing that city streets have "[h]istorically ... been viewed as the 'quintessential' public forum which has 'immemorially been

---

5. We do not suggest that the State necessarily had to offer formal rebuttal evidence in order to meet its burden of persuasion. The State could have anticipated the defense and challenged Jason's bona fide claim of right in its case in chief. In *Herd,* the State met its burden based on an agreed statement of facts.

held in trust for the use of the public . . . used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'") (citations omitted), *aff'd in part and vacated in part*, 354 Md. 18, 729 A.2d 354 (1999). It is also noteworthy that the Supreme Court has recently underscored that "the freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process clause of the Fourteenth Amendment." *City of Chicago v. Morales*, —— U.S. ——, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999)(striking down as unconstitutionally vague a Chicago "Gang Congregation Ordinance", which prohibited " 'criminal street gang members' from 'loitering' with one another or with other persons in any public place").[6] Thus, unlike *Herd*, Jason's claim of right was both subjectively and objectively reasonable.

■■■ The State argues that the defense of a bona fide claim of right "has no applicability to a person who is merely asserting that, because he was with another minor who lived in the complex, he was entitled to be on the property." According to the State, this case does not present a situation in which a visitor is asserting a right to traverse a landlord's property in order to reach someone at a particular dwelling. The State argues: "It is also not a case in which the person has been invited onto the property to visit an *adult renter* of the complex." (Emphasis added). Further, the State asserts that "there was no evidence [at Jason's trial] that a lessee or other *adult tenant* invited Jason onto the property." (Emphasis added). The import of the State's argument, then, is that because Morris was a minor and was not the lessee, his invitation to Jason did not confer upon Jason a bona fide right to enter onto the grounds. That position is not supported by the evidence, nor has the State provided us with legal authority to uphold that proposition.

---

**6.** In light of our disposition, we need not explore the impact of *Morales* on appellant's constitutional claims. We observe, however, that the Supreme Court explicitly held that the "impact on the social contact between gang members and others does not impair the First Amendment 'right of association' that [the Supreme Court's] cases have recognized." *Morales*, —— U.S. at ——, 119 S.Ct. at 1857.

In our view, the State has confused an actual or enforceable legal right with a bona fide claim of right. To be sure, the term "bona fide" is not coextensive with an established legal right. On the continuum, a bona fide claim of right does not necessarily measure up to a valid claim of right. Thus, whether Jason's cousin, a Sagner resident, could lawfully invite Jason to enter the Sagner property is beside the point, because Jason only needed a bona fide claim of right to enter the Sagner property. As we noted, Morris had resided at Sagner for approximately fourteen years as a member of a lessee's household, and the lease did not expressly prohibit minor tenants from having their friends on the property. Further, even if a minor's right to invite guests to the housing complex does not match the lessee's right, there was no evidence offered by the State to show that appellant knew or should have known that his cousin had neither authority, permission, nor the right to invite him to Sagner. Indeed, absent a sophisticated understanding by Jason of landlord-tenant rights or property rights, or knowledge that Morris had been prohibited by a parent or guardian or the lease itself from inviting Jason to visit him at Sagner, we do not see how Jason could have known that his cousin was unable to invite him lawfully to Sagner property.

The State refers us to *Gaetano v. United States*, 406 A.2d 1291 (D.C.1979), for the proposition that "a bona fide claim must have some reasonable basis before an accused can claim that such a belief exonerates his behavior." *Gaetano*, 406 A.2d at 1293. There, the court rejected claims by abortion protesters who asserted a bona fide right to remain on the premises of an abortion clinic because they believed their mission was to "save human life." *Id.* at 1292. Jason's claim of right is identical to one the District of Columbia court speculated would constitute a bona fide claim of right. Jason's belief that he was invited by a resident onto the Sagner complex grounds stands in marked contrast to the abortion protestors' assertion that they had a moral obligation to "save lives." *See also Darab v. United States*, 623 A.2d 127 (1993)(rejecting a claim by Muslim protesters at a District of

Columbia mosque that their unlawful entry convictions should be reversed because they acted under a sincere belief that the Koran authorized their entry).

Several cases from other jurisdictions support our view that Jason held an objective and subjective reasonable belief as to his bona fide status. We turn to examine these cases.

The facts attendant here are comparable to those in *L.D.L. v. State*, 569 So.2d 1310 (Fla.App.1990), in which the Florida Court reversed the conviction of a juvenile for the statutory offense of "trespass after warning." There, a public housing complex in Tallahassee authorized the local police department to issue no-trespassing notices to "any persons loitering on the property who are not residents." *Id.* at 1311. On November 21, 1988, the police issued a trespassing notice to the appellant, who was "loitering around the laundry area of the apartment complex." *Id.* More than four months later, on March 30, 1989, police officers saw the juvenile again near the laundry room. The juvenile attempted to flee, and the police gave chase; the youngster was apprehended near the apartment of a woman named Linda Rollins. When the police questioned the youngster at the scene, he claimed that he "stayed" with Rollins. At trial, Rollins testified that the juvenile was a "good friend of the family" and "is allowed to be a visitor to her apartment." *Id.* Rollins also said that, when appellant was arrested, her son was with the accused, on the porch outside her apartment. Moreover, the juvenile testified at trial that his friends, grandmother, and brother lived in the same housing complex. *Id.*

On appeal, the court found the evidence insufficient to support the juvenile's conviction. The court reasoned: "A landlord generally does not have the right to deny entry to persons a tenant has invited to come onto his property. This law also applies to the common areas of the premises." *Id.* at 1312. In reaching that result, the court quoted from 49 Am.Jur.2d, *Landlord and Tenant* § 235:

In the absence of any restriction in the agreement between the landlord and his tenant, the tenant, when in possession

of the demised premises, has the right to invite or permit such persons as his business interests or pleasure may suggest to come upon the premises so in his possession, for any lawful purpose, *and the landlord has no right to prohibit such persons from coming on the demised premises. One who thus comes upon the premises upon the invitation of the tenant, although expressly forbidden to do so by the landlord, is not guilty of criminal trespass.*

*L.D.L.*, 569 So.2d at 1312–13 (emphasis added).

A recent case from the Supreme Court of Vermont also provides guidance. In *State v. Dixon*, 725 A.2d 920 (1999), the landlord of a privately owned apartment building caused the issuance of a notice of trespass to a tenant of his building, because he suspected that she was responsible for "certain disturbances that had occurred at ... the building." *Id.* at 921. Despite the "ban", the ousted woman maintained a friendship with the daughter of another tenant in the building. Although the daughter was not herself a tenant, she lived in her mother's apartment on a temporary basis with the consent of the landlord. *Id.* Later, police found the defendant standing outside the building, on the premises. The defendant told the police that she was aware of the trespass notice, "[b]ut that she was on the premises visiting friends." *Id.* The Vermont court reversed the woman's subsequent conviction for trespass, citing *L.D.L. Id.* at 923. The court's reasoning in *Dixon* is pertinent here:

*The common law is clear that the landlord may not prevent invitees or licensees of the tenant from entering the tenant's premises by passing through the common area. Moreover, the law is clear that an invitee or licensee who does so, even after a specific prohibition by the landlord, is not a trespasser* and does not violate a criminal trespass statute. Although a tenant may expressly or impliedly agree with the landlord to limit the rights of third persons entering the premises, and a landlord may impose reasonable regulations on the use of common areas " 'for the protection of the premises themselves or of other tenants,' " that was not the basis of this prosecution.

*Rather, the State filed and pursued this cause solely on the theory that only the nonconsent of the landlord was needed for a conviction and that the consent of a tenant to a defendant's presence in the common area was irrelevant.* *Id.* at 922–23 (emphasis added) (citations omitted). *Cf. State v. Hoyt,* 304 N.W.2d 884, 889 (Minn.1981)(holding that a caretaker who visited patients in a nursing home on a daily basis for twenty-two months at the invitation of the patients or their guardians had a bona fide claim of right to enter the nursing home sufficient to negate the intent element of criminal trespass, despite having received a letter from nursing home authorities revoking her visiting privileges).

Certainly, we recognize the Housing Authority's need to combat criminal activity at public housing projects. Thus, we emphasize that our holding does not undermine the Housing Authority's ability to invoke the provisions of Art. 27, § 577 against persons who trespass on Housing Authority property without a bona fide claim of right, or who otherwise engage in criminal activity. Because of the particular facts of this case, however, we do not address the general scope of a tenant's authority to invite a guest onto the housing complex grounds; this is not a case in which an alleged trespasser claims to have an open invitation to visit a tenant, nor is it a case in which, after the fact, a putative trespasser claims to have been on the property visiting someone, or asserts he was *en route* to a tenant's apartment. We also underscore that we do not address the right of the Housing Authority to enforce lease provisions regarding a tenant's rights with respect to social guests, nor does the opinion concern the Housing Authority's ability to promulgate reasonable restrictions on the tenants' use of the common areas.

At the same time, the Housing Authority has no more (and no less) right to exclude a social guest of a tenant than does a landlord whose tenants are not the recipients of public subsidy. What the court said in *State v. Blair,* 65 Wash.App. 64, 827 P.2d 356 (1992) applies with equal force here: "The notion that tenants of a publicly-funded housing project are entitled to less protection and have fewer rights to restrict uninvited

visitors from entering the premises than tenants of a private-ly-owned complex is not only offensive, but it also finds no support in the law." 65 Wash.App. 64, 827 P.2d 356, 358 n. 2. Because the evidence showed that Jason had a bona fide claim of right, and his conduct was not wanton, the evidence was insufficient to support the finding of trespass under Art. 27, § 577.

In view of our resolution of the trespass issue, we decline to consider appellant's constitutional claims. *See State v. Lancaster,* 332 Md. 385, 403 n. 13, 631 A.2d 453 (1993)(noting that appellate courts "will not reach a constitutional issue when a case can properly be disposed of on a non-constitutional ground"). *See also Mack v. Mack,* 329 Md. 188, 211, 618 A.2d 744 (1993); *Dabrowski v. Dondalski,* 320 Md. 392, 395, 578 A.2d 211 (1990).

## II. Sufficiency of the Evidence—Resisting Arrest

Appellant next contends that because the evidence was insufficient to support the trespass conviction, the court's judgment regarding resisting arrest should also be reversed. Appellant's argument regarding resisting arrest is set forth in a single paragraph, as follows:

The law of Maryland permits individuals to resist illegal arrests. Assuming the Court finds in favor of the Appellant on any of the above-mentioned grounds, then Appellant will be vindicated under the law. *See, Dennis v. State,* 342 Md. 196, 674 A.2d 928 (1996)(The Court upheld the right of a person to resist an unlawful arrest.)

The State's response is equally abbreviated:

Jason premises the insufficiency of evidence of resisting arrest on his assertion that the trespass arrest was illegal. As discussed in the previous arguments, that premise is erroneous, which is to say that there was sufficient evidence to support the resisting arrest conviction.

Contrary to appellant's argument, our conclusion as to the sufficiency of the State's evidence as to trespass does not compel the conclusion that Jason was unlawfully arrested

or entitled to resist the arrest. The common law crime of resisting arrest has been defined as " '[a] refusal to submit to a lawful arrest . . .' " *Monk v. State,* 94 Md.App. 738, 742, 619 A.2d 166 (1993)(quoting *State v. Huebner,* 305 Md. 601, 608, 505 A.2d 1331 (1986)). Thus, the State must prove, as an essential element, that the arrest at issue was lawful. *Id.* As to an unlawful arrest, "It is beyond cavil that 'the right to resist an unlawful, warrantless arrest remains the law of Maryland.' " *Wiegmann v. State,* 118 Md.App. 317, 330, 702 A.2d 928 (1997), *aff'd,* 350 Md. 585, 714 A.2d 841 (1998) (citation omitted). Therefore, "when confronted with an unlawful, warrantless arrest, one may lawfully resist by resorting to reasonable force." *Wiegmann,* 118 Md.App. at 330, 702 A.2d 928.

The right to resist an illegal arrest is not without limits, however. Accordingly, "one may not resist with excessive or unreasonable force." *Wiegmann,* 118 Md.App. at 330, 702 A.2d 928; *see Rodgers v. State,* 280 Md. 406, 421, 373 A.2d 944, *cert. denied,* 434 U.S. 928, 98 S.Ct. 412, 54 L.Ed.2d 287 (1977); *Jenkins v. State,* 232 Md. 529, 534, 194 A.2d 618 (1963)(noting that "one threatened with an illegal arrest may not use excessive force in resisting such arrest and if he does he himself may be charged with an unlawful assault.").

Maryland courts have repeatedly stated that probable cause is a "non-technical conception of a reasonable ground for belief of guilt, requiring less evidence for such belief than would justify conviction but more evidence than that which would arouse a mere suspicion." *Doering v. State,* 313 Md. 384, 403, 545 A.2d 1281 (1988); *see Davis v. DiPino,* 354 Md. 18, 32, 729 A.2d 354, 361 (1999); *Collins v. State,* 322 Md. 675, 680, 589 A.2d 479 (1991); *Green v. Brooks,* 125 Md.App. 349, 367, 725 A.2d 596 (1999). It has been defined as " 'facts and circumstances "sufficient to warrant a prudent [person] in believing that the [suspect] had committed or was committing an offense." ' " *Davis v. DiPino,* 354 Md. at 32, 729 A.2d at 361 (further citations omitted). In *Davis,* the Court explained the steps that comprise a probable cause analysis:

> To determine whether an officer had probable cause ... the reviewing court necessarily must relate the information known to the officer to the elements of the offense that the officer believed was being or had been committed. The officer, of course, must undertake the same analysis in determining, in the first instance, whether the person may lawfully be arrested.

*Davis,* 354 Md. at 32, 729 A.2d at 361.

■■■ Based on the circumstances of this case, we are satisfied that Officer Custead lacked probable cause to believe that appellant had committed a trespass. Therefore, the arrest was unlawful, and appellant had a common law right to use reasonable force to resist. Although the parties have provided little guidance in discussing this issue, our own research has uncovered two cases from other jurisdictions that convince us that Jason's second arrest, some two hours after his initial arrest on September 22, 1997, was not based on probable cause. We turn to consider those cases.

In *State v. Blair, supra,* 65 Wash.App. 64, 827 P.2d 356, a suspect charged with possession of cocaine moved to suppress evidence that was discovered in a search incident to an arrest for criminal trespass. The suspect, Blair, was arrested for trespass in Roxbury Village, a public housing complex owned and operated by the Seattle Housing Authority ("SHA"). *Id.* at 357–58. Under a Seattle ordinance, "if a person is not licensed, invited or otherwise privileged to enter or remain on the premises of Roxbury Village, he or she is guilty of second degree criminal trespass." Like the case *sub judice,* the SHA had entered into an agreement with the Seattle Police Department whereby the police were authorized to "warn and arrest anyone trespassing on the premises." *Id.* at 357.

On August 8, 1989, a Seattle officer saw Blair "participate in what [the officer] believed was a drug transaction on the premises." *Id.* The officer then warned Blair "not to return to Roxbury Village." *Id.* Less than a month later, on September 1, 1989, the same officer saw Blair "walking into Roxbury Village with a friend...." *Id.* at 358. The officer

arrested Blair for trespassing, without attempting to discover why Blair was on the premises. At trial, Blair testified that he was there to visit a friend named "Freda," who had promised to braid his hair. *Id.* at 358. At the suppression hearing, the manager of the apartment complex testified that Freda's name did not appear on the list of residents. Blair claimed, however, that Freda may have been living as a guest of a resident family. *Id.*

The Washington intermediate appellate court held that although the officer may have had an "articulable suspicion" that Blair was trespassing, sufficient to justify the officer's stopping Blair to ask further questions, "the fact that the officer had told Blair not to return to the premises [did] not, in itself, create probable cause for arresting him on the charge of criminal trespass." *Id.* at 359. Of significance here, the court noted that "[h]ad [the officer] taken a moment to ask Blair where he was going and for what purpose, he could have determined whether Blair was in fact visiting a friend or was trespassing." *Id.*

The case of *Jones v. Commonwealth*, 18 Va.App. 229, 443 S.E.2d 189 (1994), is also instructive. There, the owner of a private apartment complex in Richmond, Virginia complained to the police about trespassing and drug dealing in the parking lot of the development. *Id.* at 190. The owner posted "no trespassing" signs on the property and asked the police to monitor the grounds. Thereafter, police officers in an unmarked car drove by the property and noticed two men standing on the sidewalk near a parked car. Two people were in the parked car. When the officers exited their vehicle and approached the men on the sidewalk, one of them, Jones, ran. *Id.* Two of the officers chased the fleeing suspect while the other "had a conversation" with the man who had been standing next to him. During that conversation, the officer learned that Jones's companion was a resident of the apartment building. After he was apprehended, Jones told the officers that he lived across the street, in a building not part of the apartment complex.

After the officers arrested Jones for trespassing, they conducted a search incident to the arrest, and discovered "$1,342 in cash and a small glassine packet of heroin." *Id.* Jones moved to suppress, arguing that the officers did not have probable cause to arrest him for trespassing. Although the lower court denied Jones's motion to suppress, the intermediate appellate court reversed. It reasoned, in part, that "in order for Jones's presence on the premises to give rise to probable cause to arrest for trespassing, [the arresting officer] must have had a reasonable basis to conclude that Jones was neither a resident nor a guest of a resident.." *Id.* at 191. The court explained:

> Jones's mere presence with another man on the premises at four o'clock in the afternoon near an automobile parked on a street by an apartment complex was insufficient to establish probable cause to believe that Jones was neither a resident of the apartment complex *nor legitimately upon the premises at the invitation of a resident.* The officer's observation permitted only a bare suspicion. Indeed, the officer's assertion that Jones and the other man were "hanging out" did not add sufficient information to raise his suspicion of trespassing to probable cause.

*Id.* at 191 (emphasis added).

The above cited cases are persuasive here. Officer Custead's mere observation of Jason "hanging out" on the sidewalk at the housing project two hours after an earlier and arguably invalid arrest for trespassing was insufficient to establish probable cause that Jason was a criminal trespasser.

We reiterate that, in evaluating probable cause, we must relate what the officer knew about the circumstances of the arrest to "the elements of the offense that the officer believed was being or had been committed." *Davis,* 354 Md. at ——, 729 A.2d at 361. Here, appellant was arrested for trespassing, not for loitering. Thus, the fact that appellant was "hanging out" on the property provides very little guidance as to whether Officer Custead had probable cause to believe appellant was a trespasser.

In our view, Officer Custead's own testimony provides the most telling barometer as to what "information" was "known" to him prior to the arrest. *Davis,* 354 Md. at 32, 729 A.2d at 361. Officer Custead testified that he was dispatched to Sagner a second time on September 22, 1997, because he "was advised that [Jason] had returned to the property and was harassing the security guards there." The State conceded, however, and the court agreed, that Officer Custead's comment about "harassing the security guards" could not be used for a substantive purpose, and the State did not attempt to offer any corroborating evidence in support of the officer's remark. Because the court did not attach significance to it, neither do we.

Beyond the dispatcher's hearsay statement, therefore, and Jason's mere presence at Sagner, there was no evidence that, when the officers initiated the second arrest, Jason was engaged in any unlawful conduct. Rather, by Officer Custead's own admission, it was "clear" to him that he would make a trespassing arrest once he saw Jason on the property.

For the purpose of analyzing probable cause, we review what Officer Custead knew when he sought to arrest Jason for trespassing: 1) Jason was on Sagner property; 2) Jason was not a resident; 3) Jason had received a no-trespassing notice; 4) Jason had been arrested less than two hours earlier for trespassing at Sagner, although Jason was not on Sagner property when the first arrest occurred. Yet, Officer Custead's own knowledge about the questionable validity of the earlier arrest diffuses the import of Jason's later reappearance on the property. Further, although the officer saw appellant with a group of people, he conceded that he had no information about Jason's relationship to the persons who were with him, no knowledge as to whether any of the persons with Jason resided at Sagner, nor did the officer inquire of Jason or the others about Jason's presence at Sagner.

As in *Blair* and *Jones,* Officer Custead ignored the possibility that appellant was at Sagner at the invitation of an authorized resident. Like *Blair* and *Jones,* we conclude that, on

these facts, Officer Custead did not have probable cause to make an arrest. Because Jason's arrest was not lawful, Jason had a right to use reasonable force to resist it. But, the trial court did not address the question of whether Jason's resistance was reasonable or excessive under the circumstances. *State v. Wiegmann,* 350 Md. 585, 714 A.2d 841 (1998), is instructive here.

In *Wiegmann,* the defendant had appeared before a domestic master for a contempt hearing related to his failure to pay child support. At the conclusion of the hearing, the master concluded that Wiegmann was in contempt and that he should be incarcerated immediately. Thereafter, two sheriff's deputies attempted to place handcuffs on Wiegmann. A scuffle ensued that eventually led to charges against Wiegmann for resisting arrest and assault and battery. *Id.* at 321, 702 A.2d 928. Wiegmann argued that his arrest was unlawful because the master lacked the authority to order his detention. At trial, the court concluded that the arrest was lawful, and thus declined to instruct the jury about the common law right to resist an unlawful arrest.

The Court of Appeals agreed with the defendant that the domestic master lacked authority to arrest him. Because the arrest was illegal, the case was remanded to the circuit court to determine whether, in resisting the arrest, the appellant resorted to the use of reasonable or excessive force. Similarly, we must remand to the trial court to consider whether appellant resorted to the use of reasonable or excessive force when he resisted the arrest.

**FINDING OF DELINQUENCY AS TO TRESPASS REVERSED; FINDING OF DELINQUENCY AS TO RESISTING ARREST VACATED; CASE REMANDED TO THE CIRCUIT COURT FOR FREDERICK COUNTY FOR FURTHER PROCEEDINGS; COSTS TO BE PAID BY FREDERICK COUNTY.**